382 So.2d 654 (1980)
J. Hyatt BROWN, Etc., et al., Petitioners,
v.
George FIRESTONE, etc., et al., Respondents.
No. 57959.
Supreme Court of Florida.
March 13, 1980.
*657 Talbot D'Alemberte and Donald M. Middlebrooks of Steel, Hector & Davis, Miami, and William T. Ryan, Sharyn L. Smith and James E. Eaton, House of Representatives, Tallahassee, for petitioners.
Jim Smith, Atty. Gen., and J. Kendrick Tucker, Deputy Atty. Gen., Tallahassee, for Secretary of State.
S. Craig Kiser, Deputy Gen. Counsel and Michael Basile, Asst. Gen. Counsel, Tallahassee, for Comptroller of the State of Florida.
John K. Aurell, Gen. Counsel, Tallahassee, for Governor Graham.
Chesterfield Smith and Bill McBride of Holland & Knight, Tampa, Larry Levy of Dickinson, Levy & Taylor, James R. Eddy, Pompano Beach, Donald H. Reed, Jr., Boca Raton, and Ralph Turlington, Commissioner of Education, Tallahassee, for amici curiae.
SUNDBERG, Justice.
By petition for writ of mandamus, Messrs. J. Hyatt Brown, Herbert F. Morgan, S. Curtis Kiser, and Ralph H. Haben, Jr., as citizens and taxpayers, question the constitutional validity of a number of Governor Bob Graham's vetoes of provisions of chapter 79-212, Laws of Florida, known as the General Appropriations Act of 1979. Nominal respondents are George Firestone, Secretary of State, and Gerald Lewis, Comptroller of the State of Florida. Governor Graham was added as party respondent on November 1, 1979. Petitioners seek a judicial determination invalidating the Governor's vetoes, and the issuance of an order requiring the Secretary of State to expunge the vetoes from the official records of the state and preventing the Comptroller from disbursing state funds based on such vetoes. Jurisdiction is asserted under article V, section 3(b)(5), Florida Constitution.
After receiving the Governor's budget recommendations and conducting hearings, drafting bills and conferring through a conference committee, the Florida Legislature adopted by vote of each house Senate Bill 1297, now enacted into law as chapter 79-212. On June 28, 1979, the Governor filed with the Secretary of State his official message approving the General Appropriations Act subject to certain vetoes made under authority of article III, section 8, Florida Constitution. The vetoes here under consideration and the provisions in the Appropriations Act to which they presumably relate follow, numbered 1 through 6:

 No.1 Appropriations Act, p. 33
 Department of Corrections
 Major Institutions
 Provided that the department shall phase back the inmate count
 at Glades Correctional Institution to the design capacity of 609
 inmates prior to June 30, 1980. Except, however, that should
 the statewide inmate population exceed maximum capacity then
 Glades Correctional Institution may exceed design capacity.
 250 Salaries and Benefits Positions 6,288 6,459
 From General Revenue Fund ................. 72,614,708 74,029,307
 From Correctional Work Programs Trust Fund 3,310,676 3,343,857
*658 From Grants and Donations Trust Fund ...... 967,100 969,465
 From Operating Trust Fund ................. 84,675 84,700

Governor's Veto Message, p. 6
On page 33 after item 249, under the heading, Major Institutions, is a proviso which deals with the prison population at Glades Correctional Institution. Since this proviso relates to an executive management issue and is on a subject other than appropriations, which is contrary to Article III, Section 12 of the State Constitution, this proviso, on page 33 after item 249, under the heading, Major Institutions, which reads as follows, is hereby vetoed:
"Provided that the department shall phase back the inmate count at Glades Correctional Institution to the design capacity of 609 inmates prior to June 30, 1980. Except, however, that should the statewide inmate population exceed maximum capacity then Glades Correctional Institution may exceed design capacity."

 No. 2 Appropriations Act, p. 69
 University of South Florida Medical Center:
 Fiscal Year Fiscal Year
 1979-1980 1980-1981
 ITEM
 University of South Florida Medical Center
 380 Salaries and Benefits Positions 540 555
 From General Revenue Fund ................. 10,993,669 11,662,212
 From Operation and Maintenance Trust Fund 48,213 43,412
 381 Other Personal Services
 From General Revenue Fund.................. 810,843 923,353
 From Medical Center - Professional Medical
 Liability Self Insurance Trust
 Fund .................................... 25,000 25,000
 From Operation and Maintenance Trust Fund 53,278 56,208
 382 Expenses
 From General Revenue Fund ................. 4,514,259 4,681,139
 From Medical Center - Professional Medical
 Liability Self Insurance Trust
 Fund .................................... 168,500 168,500
 From Operation and Maintenance Trust Fund 609,049 658,621
 383 Operating Capital Outlay
 From General Revenue Fund ................. 793,190 827,285
 From Operation and Maintenance Trust Fund 73,805 150,168
 Provided, however, $2,613,142 appropriated in item 382 in each
 fiscal year of the biennium is for the purpose of the teaching hospital
 program.

Governor's Veto Message, p. 12
Included in item 382 on page 69 is $2,613,142 for each year of the biennium from the General Revenue Fund for the teaching hospital program. This is set out in the proviso following item 383. At the time of establishment of the USF Medical School, it was understood by all concerned that a full program of medical education could be achieved by reliance on the facilities available in the Tampa Bay community hospitals and the establishment of a state supported teaching hospital would not be necessary. Therefore, the proviso following item 383, on page 69, which constitutes an appropriation, and reads as follows, is hereby vetoed:
"Provided, however, $2,613,142 appropriated in item 382 in each fiscal year of the biennium is for the purpose of the teaching hospital program."

*659
 No. 3 Appropriations Act, p. 152
 Division of Corporations
 Corporations, Division of
 1131 Salaries and Benefits Positions 108 108
 From General Revenue Fund ............. 957,613 978,882
 Provided, that in addition to the funds appropriated in item 1131
 for salaries and benefits for the Bureau of Uniform Commercial
 Code, if HB 1643 or SB 1256 is enacted into law, the Bureau of
 Uniform Commercial Code is specifically authorized to utilize up
 to $100,000 of the deficiency fund upon approval of the Department
 of Administration. Such deficiency funds may be used to
 supplement the positions provided by this bill and shall be approved
 by the Department of Administration, upon a showing of need
 by the director of the Division of Corporations based upon the following
 schedule: For every additional 5,000 Uniform Commercial
 Code documents filed in fiscal year 1980-81 above those documents
 filed in fiscal year 1979-80, one additional position.
 1132 Other Personal Services
 From General Revenue Fund .............. 35,000 35,000
 1133 Expenses
 From General Revenue Fund .............. 273,770 276,672
 1134 Operating Capital Outlay
 From General Revenue Fund .............. 65,574 45,441
 1135 Data Processing Services
 From General Revenue Fund .............. 677,051 608,101

Governor's Veto Message, pp. 14-15
On page 152 following item 1131 is a proviso which reserves the use of $100,000 of the Deficiency Appropriation to the Department of State  Division of Corporations. This proviso is contrary to Section 216.231, Florida Statutes, which provides procedures for the release of Deficiency Funds upon approval of the Governor and three other members of the Administration Commission. My budget recommendation provided for a Deficiency Fund of $1,461,130; however, the legislature only appropriated $400,000. It would not be prudent to reserve a portion of this deficiency appropriation and further limit the ability of the Administration Commission to respond to agency needs. If the Division's workload should increase as is anticipated by the proviso, a deficiency request could be submitted to the Administration Commission for review on its own merits. Therefore, this proviso, on page 152 following item 1131, which reads as follows, is hereby vetoed:
"Provided, that in addition to the funds appropriated in Item 1131 for Salaries and Benefits for the Bureau of Uniform Commercial Code, if House Bill 1643 or Senate Bill 1256 is enacted into law, the Bureau of Uniform Commercial Code is specifically authorized to utilize up to $100,000 of the Deficiency Fund upon approval of the Department of Administration. Such deficiency funds may be used to supplement the portions provided by this bill and shall be approved by the Department of Administration, upon a showing of need by the Director of the Division of Corporations based upon the following schedule: for every additional 5,000 Uniform Commercial Code documents filed in Fiscal Year 1980-81 above those documents filed in Fiscal Year 1979-80, one additional position."

*660
 No. 4 Appropriations Act, p. 186
 Division of Recreation and Parks
 Natural Resources, Department of Recreation and
 Parks, Division of
 6G Fixed Capital Outlay
 Park Development
 From Land Acquisition Trust Fund ........ 8,000,000 6,250,000
 Provided, however, from funds appropriated in item 6G the following
 park projects for 1979-80 totaling $2,020,000, Cedar Key,
 Lake Rousseau, Manatee Springs, Kingsley Plantation, Wekiwa
 Springs, Bill Baggs, Hugh Taylor and the Barnacle, shall be considered
 as first priority projects by the Department of Natural
 Resources.
 6H Fixed Capital Outlay
 Beach Front/Destin, FL
 From General Revenue Fund ................. 4,000,000
 6I Fixed Capital Outlay
 Big Lagoon/Perdido Key Development
 From General Revenue Fund ................. 1,000,000 1,000,000
 From Land Acqusition Trust Fund ........... 750,000 750,000
 7 Fixed Capital Outlay
 Land Acqusition
 From Land Acqusition Trust Fund ........... 10,250,000 8,000,000

Governor's Veto Message, p. 17
After Item 6G on page 186 is a proviso which earmarks $2,020,000 funding provided in a larger lump sum for Park Development for use at specific parks. I am not supportive of a funding plan which singles out a group of parks for special consideration. Therefore, the proviso on page 186 after item 6G which reads as follows, is hereby vetoed:
"Provided, however, from funds appropriated in item 6G the following park projects for 1979-80 totaling $2,020,000, Cedar Key, Lake Rousseau, Manatee Springs, Kingsley Plantation, Wekiwa Springs, Bill Baggs, Hugh Taylor and the Barnacle, Shall be considered as first priority projects by the Department of Natural Resources."

 No. 5 Appropriations Act, pp. 191-192
 OB Fixed Capital Outlay to Boards of Trustees of
 the Community Colleges From Public Education
 Capital Outlay and Debt Service Trust
 Fund .......................................... 27,192,240 2,573,035

From the funds appropriated in item OB $4,953,577 shall be allocated to the Boards of Trustees at Palm Beach Community College to construct the North Campus of Palm Beach Community College. In accordance with Section 235.221, Florida Statutes, Brevard Community College shall be advanced funded in an amount equal to the difference of their prorated entitlement and $1,000,000 to meet the matching requirement in item OJ.
From the cumulative total allocated to the Board of Trustees of the 28 community colleges there is to be provided $2,500,000 in the 1979-80 fiscal year and $2,500,000 in the *661 1980-81 fiscal year for library books and/or scientific and technical equipment. These funds shall be allocated based on the FTE's assigned to each college.
The remaining funds appropriated in item OB shall be allocated and expended pursuant to Section 235.435, Florida Statutes.

Governor's Veto Message, p. 21
Item OB, page 192, paragraph 3, proviso language, appropriates $2,500,000 for Community College scientific equipment and/or library books each year of the biennium. These items are of an operating nature and violate the constitutional intent of this fund. Therefore the proviso language following item OB, page 192, paragraph 3, which reads as follows, is hereby vetoed:
"From the cumulative total allocated to the Board of Trustees of the 28 community colleges there is to be provided $2,500,000 in the 1979-80 fiscal year and $2,500,000 in the 1980-81 fiscal year for library books and/or scientific and technical equipment. These funds shall be allocated based on the FTE's assigned to each college."

No. 6 Appropriations Act, pp. 192-193
 OC Fixed Capital Outlay to the Board of Regents of
 the State University System From Public Education
 Capital Outlay and Debt Service Trust
 Fund .................................... 30,936,021 28,730,637

From the cumulative total allocated to the Board of Regents of the State University System, $10,000,000 shall be provided in the 1979-80 fiscal year and $10,000,000 shall be provided in the 1980-81 fiscal year for library books.
From the above projects, exclusive of library books, the Board may allocate savings from lower than estimated project costs to emergency repairs, renovation, minor projects, building component replacement and handicap corrections.

Governor's Veto Message, p. 21
Item OC, page 193, paragraph 2, of the proviso language appropriates $10,000,000 each year for library books. With concern, I have approved $10,000,000 for university library books in 1979-80, due to a large reduction in the appropriation for books in the E & G budget. In 1980-81, the operating appropriation is much larger and can be increased as necessary. Remaining is the fact that this item is of an operating nature and violates the constitutional intent of this fund. Therefore, the part of the proviso following item OC, page 193, paragraph 2, which appropriates $10,000,000 for library books for the 1980-81 fiscal year and which reads as follows, is hereby vetoed:
"From the cumulative total allocated to the Board of Regents of the state university system, ... $10,000,000 shall be provided in the 1980-81 fiscal year for library books."
Petitioners maintain that by vetoing the above provisos and not the appropriations to which they relate, Governor Graham contravened his veto power under article III, section 8(a), which states:
Every bill passed by the legislature shall be presented to the governor for his approval and shall become a law if he approves and signs it, or fails to veto it within seven consecutive days after presentation. If during that period or on the seventh day the legislature adjourns sine die or takes a recess of more than thirty days, he shall have fifteen consecutive days from the date of presentation to act on the bill. In all cases except general appropriation bills, the veto shall extend to the entire bill. The governor may veto any specific appropriation in a general appropriation bill, but may not veto any qualification or restriction without also *662 vetoing the appropriation to which it relates.
The Governor responds that his vetoes numbered two, four, five and six are constitutional because the provisos are in fact "specific appropriations" within the intendment of article III, section 8(a). He defends vetoes numbered one and three on the grounds that those provisos are not proper qualifications or restrictions but rather an unconstitutional attempt by the legislature to enact law on other subjects in an appropriations bill, or an attempt to repeal or suspend existing law in an appropriations bill, contrary to article III, section 12, Florida Constitution, which provides:
Laws making appropriations for salaries of public officers and other current expenses of the state shall contain provisions on no other subject.
The parties do not contest either standing or jurisdiction to bring this action. Regarding standing, this Court has long been committed to the rule that a party does not possess standing to sue unless he or she can demonstrate a direct and articulable stake in the outcome of a controversy.[1] Petitioners here assail the constitutionality of the Governor's actions as citizens and taxpayers. They claim no special or extraordinary injury.[2] While it appears that their stake in the outcome of this controversy rests on an extremely slender reed, there is nevertheless recent authority supporting petitioners' assertion of standing. In Department of Administration v. Horne, 269 So.2d 659 (Fla. 1972), we held that a citizen and taxpayer could mount a constitutional attack upon the legislature's taxing and spending power without having to demonstrate a special injury. Because this dispute implicates the relationship between gubernatorial veto power and the legislature's taxing and spending authority, we believe that Department of Administration v. Horne confers standing to sue upon petitioners.
As to the propriety of entertaining this cause as a matter of original jurisdiction, the Court on two recent occasions has held mandamus to be a proper vehicle to challenge the constitutionality of provisions in a general appropriations act. In Dickinson v. Stone, 251 So.2d 268 (Fla. 1971), we invalidated a portion of a general appropriations act which sought to transfer certain duties from one executive department to another because the provision involved a subject other than appropriations, contrary to article III, section 12, Florida Constitution. In Division of Bond Finance v. Smathers, 337 So.2d 805 (Fla. 1976), then Governor Askew, doubtful of his authority to veto what he perceived to be an unconstitutional proviso, brought an action in mandamus as chairman of the Governing Board of the Division of Bond Finance to expunge the unconstitutional language from the general appropriations act. We granted a peremptory writ of mandamus and found the proviso unconstitutional without considering the propriety of the governor's veto. In both cases we held mandamus to be the appropriate remedy because the functions of government would have been adversely affected without an immediate determination. In view of these recent authorities we are obliged to conclude that the case now before us also requires an immediate determination. The challenged vetoes have cast doubt upon the expenditure of substantial amounts of public funds. Because this lingering uncertainty hampers the state's ability to finance ongoing state projects, the Court will exercise its discretion to consider this case.
We feel compelled to comment upon the peculiar posture in which this controversy presents itself. The legislature requests us to declare certain acts of the executive branch (that is, the vetoes) unconstitutional, to which the governor in effect counterclaims that his actions were prompted by unconstitutional actions of the legislative *663 branch. In such a setting the question arises: to which side of the dispute does the Court first direct its attention, the legislative or the executive? If the Court looks first to the legislative provision vetoed by the governor and finds it unconstitutional, the propriety of the governor's veto becomes immaterial.[3] If, on the other hand, the Court looks first to the propriety of the governor's veto and holds it to be constitutional, the validity of the legislative provision becomes immaterial. Thus in some instances the outcome of the case will be decided by which side of the issue is focused upon first. While this procedure may yield an equitable result in certain cases, it utterly fails to resolve the essence of the dispute now before us. Our task here is to define and delimit the relationship between the gubernatorial veto power and the legislature's authority to enact general appropriation law. Because the two concepts are so finely interwoven, and because the legislative and executive branches of government appear genuinely to be in doubt as to their respective constitutional authority in this area, we will consider the validity of both the vetoes and the legislative provisos to which they relate. We chart this course in the hopes that our efforts will serve to illuminate and clarify the intrinsic elements of this complex problem.
The dynamics of political power do not work in a vacuum. The scope of authority of each branch of government is to a large extent shaped and given meaning by the grant of and limitation upon the power of the coordinate branches. So it is that in the area of gubernatorial veto power and the enactment of general appropriation law, the constitutional authority of the legislative department is in part delimited by the scope of executive authority. Our first task, therefore, will be to outline and compare the general scope of authority conferred upon each branch of government in this field. From that comparison workable principles will emerge to govern the resolution of the specific issues before us today. We begin with the legislature.
The Florida Legislature is vested with authority to enact appropriations and reasonably to direct their use. In furtherance of the latter power, the legislature may attach qualifications or restrictions to the use of appropriated funds. In re Advisory Opinion to the Governor, 239 So.2d 1, 9 (Fla. 1970). The authority to enact appropriations is tempered by the limitation in article III, section 12, Florida Constitution, that laws making appropriations shall contain provisions on no other subject. Section 12 was intended as a corollary to article III, section 6, which mandates that every law shall embrace but one subject and matter properly connected therewith.[4] Hence a general appropriations bill must deal only with appropriations and matters properly connected therewith. See In re Advisory Opinion to the Governor; Green v. Rawls, 122 So.2d 10 (Fla. 1960); Lee v. Dowda, 155 Fla. 68, 19 So.2d 570 (1944).
Two major considerations underlie the "one subject" requirement of article III, section 12. The first is the need to prevent "logrolling" in appropriations bills. Logrolling is
a practice under which the legislature could include in a single act matters important to the people and desired by the Governor and other matters opposed by the Governor or harmful to the welfare of the state, with the result that in order to obtain the constructive or desired matter the Governor had to accept the unwanted portion. The veto power of the *664 chief executive was thereby severely limited if not destroyed and one of the intended checks on the authority of the legislature was able to be negated in practice.
Green v. Rawls, 122 So.2d at 13. The second reason behind the one subject requirement is to ensure the integrity of the legislative process in substantive lawmaking. The enactment of laws providing for general appropriations involves different considerations and indeed different procedures than does the enactment of laws on other subjects. Our state constitution demands that each bill dealing with substantive matters be scrutinized separately through a comprehensive process which will ensure that all considerations prompting legislative action are fully aired. Provisions on substantive topics should not be ensconced in an appropriations bill in order to logroll or to circumvent the legislative process normally applicable to such action. Similarly, general appropriations bills should not be cluttered with extraneous matters which might cloud the legislative mind when it should be focused solely upon appropriations matters.
Two principles logically follow from the above analysis. First, an appropriations bill must not change or amend existing law on subjects other than appropriations. This is, of course, subject to our statement in In re Advisory Opinion to the Governor, 239 So.2d at 10, that a general appropriations bill may make "allocations of State funds for a previously authorized purpose in amounts different from those previously allocated or [substitute] adequate specific appropriations for prior continuing appropriations."[5] Were we to sanction a rule permitting an appropriations bill to change existing law, the legislature would in many instances be able to logroll, and in every instance the integrity of the legislative process would be compromised.
Second, article III, section 12, will countenance a qualification or restriction only if it directly and rationally relates to the purpose of an appropriation and, indeed, if the qualification or restriction is a major motivating factor behind enactment of the appropriation. That is to say, has the legislature in the appropriations process determined that the appropriation is worthwhile or advisable only if contingent upon a certain event or fact, or is the qualification or restriction being used merely as a device to further a legislative objective unrelated to the fund appropriated? This test possesses the dispositive virtue of permitting the legislature reasonably to direct appropriation use without hampering the gubernatorial veto power or abusing the legislative process.
We now turn to the executive role in the appropriations field. Primary among executive checks on unfettered legislative power is the veto. It enables the governor to counteract legislative action which he considers to be contrary to the public interest, or if the veto is overridden, it provides him with assurance that the proposed measure is supported by a supermajority of the people's representatives. The veto power also places the governor in a stronger bargaining position from which to seek revision or amendment of bills he finds objectionable.
But the veto power is intended to be a negative power, the power to nullify, or at least suspend, legislative intent. It is not designed to alter or amend legislative intent. For example, when the legislature designates under the Department of Education $5,000,000 for salaries, the governor cannot veto the appropriation for salaries and utilize the money for another purpose; the veto must, in effect, destroy the fund. Otherwise, the governor could legislate by altering the purpose for which the money *665 was allocated. He could "create" another purpose to which to apply the appropriation.
The 1968 revision to our Florida Constitution modified the governor's theretofore existing power to veto provisions in a general appropriations bill. Article IV, section 18 of the 1885 Constitution stated that:
Sec. 18. The Governor shall have power to disapprove of any item or items of any bills making appropriations of money embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.
The corresponding section in the present constitution is article III, section 8(a), which provides:
Every bill passed by the legislature shall be presented to the governor for his approval and shall become a law if he approves and signs it, or fails to veto it within seven consecutive days after presentation. If during that period or on the seventh day the legislature adjourns sine die or takes a recess of more than thirty days, he shall have fifteen consecutive days from the date of presentation to act on the bill. In all cases except general appropriation bills, the veto shall extend to the entire bill. The governor may veto any specific appropriation in a general appropriation bill, but may not veto any qualification or restriction without also vetoing the appropriation to which it relates.
Legislative history clearly indicates that the revision contained in section 8(a) was prompted by this Court's decision in Green v. Rawls, 122 So.2d 10 (Fla. 1960). By examining the facts and precise holding of that case, we will be able to discern the reasons why the framers of the 1968 Constitution felt it necessary to revise article IV, section 18 of the 1885 Constitution.
The general appropriations bill at issue in Green contained the following items:

 13. Corrections, Division of
 a. General office
 1. Salaries  including salary of
 $12,000 per annum for the director
 and salaries of 25
 employees ............................ $ 143,580 $ 143,580
 2. Expenses ............................. 53,739 53,779
 3. Operating capital outlay ............. 12,816 7,100
 4. Special  discharge pay of inmates in
 an amount not exceeding $15 per inmate
 and transportation at not exceeding
 $25 per inmate, as provided by law .. 78,900 85,850
 Subtotal (a) ........................... $ 289,035 $ 290,309
 (Underscoring added.)
 23. Forestry, Florida Board of
 a. Salaries  including salary of
 $10,000 per annum for the state
 forester and salaries of 890 employees
 in 1959/60 and 891 employees in
 1960/61 .............................. $ 1,014,794 $1,005,004
 b. Expenses ............................. 952,013 921,542
 c. Operating capital outlay ............. 466,704 216,774
 ___________ __________
 Total of Item No. 23 .................... $ 2,433,511 $2,143,320
 (Underscoring added.)

The governor vetoed the underscored portion of item 13(a)(1) which reads "of $12,000 per annum" and the underscored portion of item 23(a) which reads "of $10,000 per annum," leaving undisturbed the remainder of items 13 and 23. The governor vetoed the *666 provisions because he felt that the salaries so fixed were inadequate for the positions involved, and that with the quoted language removed from each item the Budget Commission could fix a larger salary for each employee. Suit was brought to challenge the validity of the governor's vetoes on the grounds that the language stricken did not constitute "items" under article IV, section 18 of the 1885 Constitution.
Circuit Judge Hugh Taylor, acting in his capacity as chancellor in equity, surveyed the constitutional history of this area and concluded that the constitution envisioned that a general appropriations bill be composed of distinct items so as to permit the governor to fully exercise his veto power. He recognized, however, that a single "item" could be either general or quite specific depending upon the degree of particularization employed by the legislature. The determination of what constituted an item under article IV, section 18, would therefore depend upon the overall character of the appropriation.
Dealing specifically only with the first vetoed provision, Judge Taylor found that the item which properly could be vetoed was the $143,580 for salaries for Division of Corrections personnel. He regarded the language stricken by the governor as essentially a restriction of $12,000 from the $143,580 for the payment of the director's salary. Because the governor's vetoes extended to only part of an item, Judge Taylor held them to be unconstitutional.
Of considerably greater importance to Judge Taylor than the semantic distinction above was the effect of the challenged vetoes:
The power of the Governor to disapprove items of an appropriation bill is intended as a corollary to his power to veto all of other bills. It is the power to annul, to render invalid, to make void that "item" of appropriation which is disapproved. By common understanding, as well as by technical usage, the power to veto an appropriation means the power to prevent the expenditure of a certain part of the public funds for a certain purpose. To give effect to the veto in this case would not destroy any appropriation or render invalid any contemplated expenditure of public money... . In practical operation the action of the Governor is not to veto any item of the appropriation bill. It is to amend the bill  to take money which the Legislature said should be used for one purpose and use it for another  to use money appropriated by the Legislature for the payment of 25 employees (other than the Director) for the purpose of increasing the salary of the Director beyond that which the Legislature expressly fixed as the amount of his salary. This is not a proper function of the veto power.
Rawls v. Green, No. 16,571 (Cir.Ct.Fla. Aug. 31, 1959).
Obviously, then, the creative use of the gubernatorial veto was the primary motivating factor behind Judge Taylor's final judgment. The legislature had indicated its intent to allocate no more than $12,000 to the director. By vetoing the intent but retaining the appropriation, the executive veto revised the appropriations bill to permit a higher salary for the director. Legislative intent was not nullified, it was altered.
On appeal the Supreme Court of Florida disagreed with the chancellor's conclusions. The Court identified the $12,000 to the director as an item which could be separately vetoed. Moreover, the Court held that the governor's veto did not affect the amount of the salary appropriation.
The stage was thus set for the convening of the Constitutional Revision Commission to consider revisions to the 1885 Constitution. We believe the conclusion to be inescapable, and the minutes of the commission hearings so indicate, that the intent of the framers of the 1968 Constitution in revising article IV, section 18 of the Constitution of 1885 was to supersede this Court's decision in Green v. Rawls and thereby to reinstate Judge Taylor's analysis of the proper relationship between the executive veto power and legislative authority to enact *667 appropriations.[6] Equally clear is the fact that the framers' overriding concern was to prevent the creative exercise of the gubernatorial veto. Legislative intent was to control the expenditure of funds unless the governor was willing to forsake the funds appropriated along with the legislative direction. The following colloquy between Representative Reed and Judge Hugh Taylor, by then a member of the Revision Commission, is taken from the minutes of a Commission hearing. Judge Taylor explains the significance of Green v. Rawls and how language offered as an amendment to section 8(a) by Commissioner O'Neill would change the effect of that decision:
MR. TAYLOR: Well, are you familiar with the decision that predicated Mr. O'Neill's amendment?
MR. REED: The Rawls decision?
MR. TAYLOR: The Rawls decision, in which the appropriation read something like this: "For the Forestry Department, including a salary of X dollars for the state forester, a million dollars," when the veto did not cover the million dollars, it merely covered the X salary for the state forester, so that the result was that the gross appropriation was not changed up or down one cent, but the use to which that appropriation could be put was changed. And the courts held that that was within the scope of the governor's power to veto an item in the appropriation bill. And as I understand it, Mr. O'Neill's idea was to eliminate that power on the part of the governor.
MR. REED: Well, I don't think, Judge, it certainly isn't my intention to allow, for instance, a legislative intent, whatever that is, direction, within the appropriations bill, to be stricken, and allow a particular appropriation for that item to remain.
MR. TAYLOR: Well, isn't that exactly what happened in the Rawls case?
MR. REED: Yes, sir, at the Supreme Court level, it did. I believe at your level it was the decision 
MR. TAYLOR: But at my level that got washed out pretty quick.
16 Minutes to Constitution Revision Commission 209-210.
Notably, the language offered by Mr. O'Neill forms the basis of what is now section 8(a). The revision of section 8(a) was further refined by the legislature through the addition of the final phrase thereof.
In essence, the framers "upped the ante" on the governor. By revising article IV, section 18 of the 1885 Constitution, and most importantly by adding the qualification or restriction language of the last phrase of 8(a), the framers sought to make more difficult the governor's decision whether to veto a particular provision. If the legislature makes a specific appropriation, even if it be substantial, and if the legislature attaches a rationally and directly related qualification or restriction to that appropriation, then section 8(a) requires the governor to make the hard choice whether to give up the appropriation entirely or to follow the legislative direction for its use. This is by no means a revolutionary concept, for the veto power necessarily contemplates that in some cases salutary aspects of a legislative act will be sacrificed because the overall effect of the act is contrary to the public interest.
Petitioners make much of the change in language from that in article IV, section 18, which stated that the governor could veto any "item," to the language of article III, section 8(a), which provides that the governor may veto any "specific appropriation." We perceive this to be a matter more of a change in terminology rather than one of fundamental importance. The framers of section 8(a) were not overly concerned with how large or how small a "specific appropriation" could be. Judge Taylor recognized in Green, and the minutes of the Commission so reflect, that the form of a specific appropriation will to a large extent be determined by the manner in which the legislature *668 structures an appropriations bill. Once again, the principal motivation behind revision of article IV, section 18, was to prevent the governor from altering legislative intent by requiring him to veto both a qualification or restriction and the appropriation to which it relates.
Whether seeking to define "line item" or "specific appropriation," the concept embodied in those terms is essentially the same. A specific appropriation is an identifiable, integrated fund which the legislature has allocated for a specified purpose. It is necessarily a fluid concept which to some extent will vary as the contours of a general appropriations bill change. Thus, if the legislature deems it expedient to allocate $50,000,000 to the Department of Corrections without breaking the allocation down to its components, then that lump sum would be a specific appropriation under article III, section 8(a). Conversely, if the legislature allocated $1,000,000 of the $50,000,000 to maintenance of the corrections system, then that would be considered a specific appropriation. In each instance the legislature has designated an identifiable, integrated fund for a specified purpose. The fact that in one case the designation is broad and in the other specific is a matter of legislative judgment as to the requirements of each funding project.
In the context of a qualification or restriction, a specific appropriation is the smallest identifiable fund to which a qualification or restriction is or can be directly and logically related. In practical effect this means that in most cases where a qualification or restriction includes the setting apart of an identifiable sum of money, that fund will be considered a specific appropriation, since it will most likely be the smallest identifiable fund to which the qualification logically relates.
The implications are obvious. If the legislature deems it wise to appropriate a specific fund in a qualification or restriction, then the governor will be able to veto that qualification as a specific appropriation, just as he could have done had the legislature listed the fund as a separate line item. The fund mentioned in the qualification or restriction will of course also be nullified. This construction elevates substance to its rightful place over form. On the other hand, a qualification or restriction containing no express identifiable fund, if it logically relates even to a substantial specific appropriation, cannot be vetoed without the governor also vetoing the appropriation to which it relates. This affords the legislature substantial leverage, yet there is an internal check working upon the legislature in this regard. The fashioning of a substantial lump sum appropriation in order to avoid an executive veto would in some instances ill-serve legislative objectives, for it would merely give the governor greater latitude in directing expenditure of the money appropriated.
As noted previously, Governor Graham claims in part, as did Governor Askew in Division of Bond Finance v. Smathers, supra, that he has power to veto an unconstitutional qualification or restriction in an appropriations bill without vetoing the specific appropriation to which it relates. This cannot be. Under the Florida Constitution, the governor may exercise his veto power for any reason whatsoever. The governor must, however, exercise the veto power in a constitutional manner. He may, consistent with article III, section 8(a), either veto an entire bill, or in the case of a general appropriations bill, he may veto any specific appropriation. If he seeks to veto any qualification or restriction in a general appropriations bill, however, he must also veto the appropriation to which it relates. An attempted exercise of the veto power in any other manner is absolutely forbidden regardless of the motivation. The governor cannot act unconstitutionally to remedy a perceived unconstitutional act of the legislature.
Armed with these basic principles, we proceed into the vortex of the present controversy, namely, Governor Graham's challenged vetoes. We will first consider the validity of each of the legislative provisos, and then turn our attention to the propriety of the Governor's vetoes.

*669 1. Glades Correctional Institution

Legislative Action
We conclude that the proviso concerning inmate population at Glades Correctional Institution is not a valid qualification. The appropriation to which this qualification most logically relates is the aggregate sum for major institutions, that is, items 250-254. The purpose of the appropriation is to fund the salaries, expenses and capital outlay for the major penal institutions in the State of Florida. The proviso is not rationally related to that end, nor does it implement, advance or enhance the purpose of the appropriation. Rather, it is designed to further a legislative objective (the phasing back of the inmate population at Glades) unrelated to the funding of all the major institutions.

Gubernatorial Action
We similarly conclude that the Governor's veto of this proviso is invalid. Since there is no identifiable fund within the qualification, the Governor cannot claim that the qualification itself constitutes a specific appropriation. By vetoing the qualification without also vetoing the appropriation to major institutions, the Governor contravened his power under article III, section 8(a).

2. University of South Florida Medical Center

Legislative Action
In his veto message, infra at p. 658, Governor Graham indicates that the intent of this proviso is to authorize the establishment of a new state supported teaching hospital. The proviso itself, however, seems merely to direct the expenditure of $2,613,142 to the presumably extant "teaching hospital program." The record fails to disclose which interpretation is correct. If the proviso is simply an allocation of funds to an existing program, then it is a valid qualification. It is rationally related to the purpose of the appropriation (the funding of the expenses of the South Florida Medical Center), and it is reasonable to assume that the qualification was a major motivating factor behind the structuring of item 382. If, on the other hand, the proviso envisions the construction of a new teaching hospital, it is clearly invalid, for the creation of such a capital outlay project is not rationally related to the expenses of an already existing medical center.

Gubernatorial Action
Regardless, Governor Graham's veto of the qualification was proper. The smallest identifiable fund to which the qualification logically and directly relates is $2,613,142 in each fiscal year of the biennium. Thus the qualification itself is a specific appropriation which the Governor could rightfully veto. This means, of course, that the expense appropriation in item 382 is reduced by $2,613,142 in each fiscal year. By his veto the Governor has "render[ed] invalid [a] contemplated expenditure of public money," in the vernacular of Judge Taylor.

3. Division of Corporations, UCC Filings

Legislative Action
The purpose of this qualification is to fund the salaries for additional personnel to be provided to the Division of Corporations upon the happening of certain contingencies. It enjoys a direct and rational relationship to the appropriation in item 1131 for the positions and salaries in the Division. But the qualification is invalid nonetheless. By its express terms it authorizes expenditure of deficiency funds upon the approval of the Department of Administration. This is in direct contravention of section 216.231, Florida Statutes (1979), which permits the release of deficiency funds only upon approval of the governor and three other members of the Administration Commission.[7] Because the qualification *670 suspends pro tanto the operation of substantive law in section 216.231, it cannot stand.
Gubernatorial Action
The $100,000 mentioned in this proviso does not comprise a specific appropriation. It is not an identifiable fund allocated for a specified purpose, but rather a contingent transfer of monies from the deficiency fund to item 1131. Were the Governor permitted to veto this language, there would be no reduction of money in either the deficiency fund or item 1131. Legislative intent would not be nullified, it would be altered.

4. Division of Recreation and Parks

Legislative Action
We believe this to be a valid legislative qualification. The establishment of priorities is directly and rationally related to the appropriation for capital park improvements. The qualification implements the purpose of the appropriation, and in fact was probably a major motivating factor behind the structuring of the appropriation.

Gubernatorial Action
By the same token, we believe the Governor's veto to be constitutional. The smallest identifiable fund to which the qualification relates is the $2,020,000 contained within it, thus the qualification comprises a specific appropriation. The Governor's veto reduces the funds in item 6G by $2,020,000.

5. and 6. Library Books and/or Scientific Equipment for
 
Community Colleges and State University System

Legislative Action
The proviso in 5 purports to appropriate $2,500,000 in each fiscal year of the biennium for library books and/or scientific equipment out of the cumulative total allocated to the Board of Trustees of the Community Colleges, while the proviso in 6 appropriates $10,000,000 each fiscal year for library books out of the total allocated to the Board of Regents of the state university system. The issue is whether these restrictions are unconstitutional because they are operating expenditures not permitted under the capital project language of article XII, section 9(a)(2) of the Florida Constitution.
Article XII, section 9(a)(2), Florida Constitution, requires that the revenues derived from gross receipts taxes be placed in a trust fund known as the "Public Education Capital Outlay and Debt Service Trust Fund" (PECO). The provision states that PECO funds are to be used for, inter alia, "direct payment of the cost or any part of the cost of any capital project for the state system theretofore authorized by the legislature." Governor Graham submits that the term "capital project" in this section includes only expenditures for the acquisition, construction and capital maintenance of real property, and therefore does not contemplate the expenditure of PECO funds for library books and scientific equipment.
We disagree with the Governor's interpretation and hold that PECO funds may be used to purchase library books and scientific equipment. While there are no decisions construing the term, the legislature has defined "capital project" in implementing article XII, section 9(a)(2). Section 235.011(10), Florida Statutes (1979), states that "`[c]apital project' means sums of money appropriated to the Public Education Capital Outlay and Debt Service Trust Fund for the state system of public education." In addition, section 235.435(3)(d), Florida Statutes *671 (1979), specifically lists library books and equipment as a proper PECO expenditure. Although it is the intent of the people we must effectuate in construing a constitutional provision, the legislature's view of its constitutional authority is highly persuasive. Gallant v. Stephens, 358 So.2d 536 (Fla. 1978). We also note that the legislature enacted section 235.435(3)(d) in 1977, only three years after adoption of the constitutional amendment to article XII, section 9. A relatively contemporaneous construction of the constitution by the legislature is strongly presumed to be correct. Greater Loretta Improvement Ass'n v. State ex rel. Boone, 234 So.2d 665 (Fla. 1970).
Ironically, this analysis is in accord with the executive branch's own interpretation of article XII, section 9(a)(2). Section 6A-2.205(5), Florida Code of Administrative Rules (1979), lists equipment and furnishings for new and existing educational facilities and supplies with at least a one-year life expectancy as appropriate capital outlay expenditures. See also section 6A-206(1)(b)2. In addition to these rules, the Department of Education publishes a manual entitled Financial and Program Cost Accounting and Reporting for Florida Schools, in which library books are listed as the first entry under "Capital Outlay," account number 600.

Gubernatorial Veto
Be that as it may, the restrictions in both 5 and 6 clearly constitute specific appropriations which the Governor could properly veto. The smallest identifiable sum to which the restriction in 5 relates is $2,500,000, and in 6, $10,000,000. Thus, the total allocation to the community colleges will be reduced by $2,500,000 in each fiscal year of the biennium, and the total allocation to the state university system will be reduced by $10,000,000.
We close with the admonition that it would be a serious mistake to interpret our acceptance of jurisdiction in this cause as a general willingness to thrust the Court into the political arena and referee on a biennial basis the assertions of power of the executive and legislative branches in relation to the appropriations act. Mandamus is an extremely limited basis for jurisdiction which traditionally has been, and will continue to be, employed sparingly. Shevin ex rel. State v. Public Service Comm'n, 333 So.2d 9 (Fla. 1976); Heath v. Becktell, 327 So.2d 3 (Fla. 1976); Dickinson v. Stone, 251 So.2d 268 (Fla. 1971). Hence future attempts to invoke this Court's jurisdiction on similar grounds will be viewed with great circumspection.
To that end we outline the proper shape which similar litigation should assume in the future. Any person, as citizen and taxpayer, may bring suit and have stricken a gubernatorial veto of a qualification or restriction in a general appropriations bill, even if the qualification or restriction is clearly unconstitutional, unless the governor can successfully demonstrate that the qualification or restriction itself constitutes a specific appropriation within the intendment of article III, section 8(a). In such a proceeding no issue may be raised as to the constitutionality of the qualification or restriction. That is, the governor cannot counterclaim that his action was prompted by an unconstitutional legislative act. In this context a mandamus action should be limited to narrow issues of law which do not require extensive fact-finding.
On the executive side of the ledger, any person, as citizen and taxpayer, may bring a declaratory judgment action to challenge the constitutionality of provisions in a general appropriations act. As exemplified in the discussion of the proviso relating to the South Florida Medical Center, the absence of a record is a major obstacle to a comprehensive resolution of a complex issue in this case. A declaratory judgment suit in circuit court will obviate this problem by enabling the parties to develop a full record upon which the court can base an intelligent decision.
Accordingly, we hold that the proviso language here at issue which is attached to the appropriations identified herein as 1 and 3 is null and void because it violates article *672 III, section 12, Florida Constitution. We hold further that the vetoes identified herein as 2, 4, 5 and 6 are valid as being within the purview of the executive power granted by article III, section 8(a), and that the appropriations bill is reduced by the amount of the specific appropriations to which those vetoes relate.
It is so ordered.
ENGLAND, C.J., and BOYD, OVERTON, ALDERMAN and McDONALD, JJ., concur.
ADKINS, J., concurs specially with an opinion.
ADKINS, Justice, concurring specially.
I concur with that portion of the opinion which outlines the general veto power of the governor.
However, when the governor vetoes a provision which has been unconstitutionally included in a general appropriations bill by the legislature, the Court should declare the improperly included provision to be unconstitutional and void. Then, it would not be necessary for the Court to consider the issue of the constitutional validity of the governor's veto.
In Lee v. Dowda, 155 Fla. 68, 19 So.2d 570 (1944), the Court considered a challenge to the validity of the governor's veto of a section of the 1943 General Appropriations Act. The propriety of the veto was justified to the Court on the ground that the legislature had unconstitutionally included the vetoed provision in the general appropriations bill. Interestingly, the constitutional provision with which the vetoed provision conflicted in Lee v. Dowda was the identical provision which is now known as article III, section 12:
Article III, Section 30: Laws making appropriations for the salaries of public officers and other current expenses of the State shall contain provisions on no other subject.
The Court held the provision to be unconstitutional and declined to reach the issue of the constitutional validity of the governor's veto stating:
We have carefully considered the able arguments of counsel for the respective parties, including the citations of the decisions in other states as set forth in their briefs, but we find nothing that would lead us to depart from the plain language of section 30 of article III of our Constitution and our previous opinions so clearly construing it. Our conclusion is that under said section 30 of Article III, the inclusion of section 14 in the general appropriation act of 1943 was not authorized, and that said section was unconstitutional and void. Therefore the plaintiffs in the court below were not and are not injured by the Governor's veto of a section which was already void. (emphasis added).
Id. at 573.
Similarly, in Division of Bond Finance v. Smathers, 337 So.2d 805 (Fla. 1976), the Court considered a challenge to the constitutionality of a proviso of the 1976 General Appropriations Act as well as the validity of the governor's veto of the same proviso. Upon a finding that the proviso was unconstitutional, the Court said:
We need not consider the issue of the constitutional validity of the Governor's veto because we hold the proviso to be unconstitutional.
Id. at 807. See also Dickinson v. Stone, 251 So.2d 268 (Fla. 1971), where the Court even without a gubernatorial veto held that unconstitutional proviso language in the General Appropriations Act of 1971 should be expunged.
When the legislature includes in the general appropriations bill a provision which the Constitution does not permit, the Court should declare the provision unconstitutional and void. It is not, in such circumstances, necessary for the Court to consider the constitutional validity of the governor's veto of the provision.
NOTES
[1] Renard v. Dade County, 261 So.2d 832 (Fla. 1972); Smith v. Ervin, 64 So.2d 166 (Fla. 1953).
[2] In certain instances a party will not have standing unless he can show a "special injury." Rickman v. Whitehurst, 73 Fla. 152, 74 So. 205 (1917).
[3] This was the effect of our holding in Division of Bond Finance v. Smathers, 337 So.2d 805 (Fla. 1976). See also Lee v. Dowda, 155 Fla. 68, 19 So.2d 570 (1944).
[4] Art. III, § 6:

Laws.  Every law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title. No law shall be revised or amended by reference to its title only. Laws to revise or amend shall set out in full the revised or amended act, section, subsection or paragraph of a subsection. The enacting clause of every law shall read: "Be It Enacted by the Legislature of the State of Florida:".
[5] We recognize that our decision in Thomas v. Askew, 270 So.2d 707 (Fla. 1972), could be interpreted as affording the legislature greater latitude than the above rule would permit. Stripped of its overly broad language, however, Thomas can be reconciled with our decision today. In Thomas we did nothing more than uphold that part of the 1972 General Appropriations Act which allocated "State funds for a previously authorized purpose in [an] amounts different from [that] previously allocated." To the extent that the language in Thomas cannot be reconciled with this decision, it is hereby expressly disapproved.
[6] It is of no small significance that Judge Taylor was a member of the Constitutional Revision Commission and instrumental in revision of article IV, section 18.
[7] § 216.231(1), Fla. Stat. (1979):

Any appropriation to the department which is classified as "emergency," or "deficiency," may be released only with the approval of the Governor and three other members of the Administration Commission. The state agency desiring the use of any such appropriation shall submit to the department application therefor in writing setting forth the facts from which the alleged need arises. The commission shall, at a public hearing, review such application promptly and approve or disapprove the same as the circumstances may warrant. All actions of the commission shall be reported to the legislative appropriation committees, and the committees may advise the commission relative to the release of such funds.
(Footnotes omitted.)