555 So.2d 839 (1990)
Florida HOUSE OF REPRESENTATIVES, et al., Petitioners,
v.
Bob MARTINEZ, Etc., et al., Respondents.
No. 74747.
Supreme Court of Florida.
January 11, 1990.
Rehearing Denied February 14, 1990.
*840 Kevin X. Crowley of Cobb, Cole & Bell, Tallahassee, for petitioners.
Peter M. Dunbar, Gen. Counsel, Office of Governor, Tallahassee, and Alan C. Sundberg and Cynthia S. Tunnicliff of Carlton, Fields, Ward, Emmanuel, Smith and Cutler, P.A., Tallahassee, for The Hon. Bob Martinez.
Kenneth Rouse, Gen. Counsel, Dept. of State, Tallahassee, for Jim Smith.
William G. Reeves, Gen. Counsel, and Jo Ann Levin, Sr. Atty., The Capitol, Legal Section, Tallahassee, for Gerald Lewis.
KOGAN, Justice.
The Florida House of Representatives petitions for a writ of mandamus ordering the Florida Secretary of State to expunge from his official records gubernatorial vetoes directed at portions of the 1989 appropriations act, chapter 89-253, Laws of Florida (the "Act"). Petitioners also request that, in the same writ, we order the Florida Comptroller to make other adjustments to state financial records to reflect these expunctions. We have jurisdiction. Art. V, § 3(b)(8), Fla. Const.

I.
The sources of the present controversy are vetoes issued by Governor Bob Martinez that purport to nullify seven portions of the Act. Members of the House of Representatives challenge these vetoes as a violation of the Florida Constitution.
Veto number one was directed at the following language in the Act:

 Specific Appropriation 5
 5 Lump Sum
 Salary Increases
 From General Revenue Fund ........... 76,411,208
 From Educational Enhancement
 Fund .............................. 6,433,236
 From Trust Funds .................... 21,632,810
 ... .

Funds are provided in Specific Appropriation 5 for adjustments to selected legal positions in the Florida Department of Legal Affairs, to be distributed at the discretion of the Attorney General. The effective date of any salary adjustments given in accordance with this provision shall be January 1, 1990. The Attorney General is authorized to exceed the maximum of the pay grade for up to eight Assistant Attorney General positions.
The Governor gave the following reason for his veto in his Veto Message:
Proviso language in Section 1.1.2.D.2), [sic] paragraph 3, on pages 293 and 294, providing for salary adjustments to selected positions in the Department of Legal Affairs, is hereby vetoed. The funds appropriated for this purpose in Appropriation 5 are $300,000 from the General Revenue Fund and $61,070 from Trust Funds. These increases are in addition to the 4% pay increases provided for all Selected Exempt Service employees. It is inappropriate and inequitable to provide certain employees with extra benefits.
Veto number two was directed at the following language in the Act:

 Specific Appropriation 500
 500 Specific Categories
 Grants and Aids  Dropout Prevention
 From Educational Enhancement
 Trust Fund ................. 11,494,153

*841 From the funds provided in Specific Appropriation 500:
... .
19. $4,000,000 is for Florida First Start as described in CS/HB 1160 or similar legislation and $100,000 shall be allocated for the Toddler Intervention program (TIP) in Dade County.
The Governor's Veto Message contained the following relevant statement:
Proviso language following Appropriation 500 on page 84 appropriating $3,900,000 from the Educational Enhancement Trust Fund for Florida First Start is hereby vetoed. This appropriation creates the Florida First Start Program for handicapped and at-risk children from birth to age three. The specific program objectives and services to be provided are not educational, but are social services more properly delivered by the Department of Health and Rehabilitative Services. The projected cost to fully implement this program is in excess of $80 million. Before a new program of this magnitude is begun, an in-depth analysis of current programs at the local, state and federal levels should be conducted. Currently, the Department of Education is developing a comprehensive, coordinated system of early intervention services for handicapped and at-risk children aged 0 to 3 funded by a federal grant under PL99-457, Part H  Infants and Toddlers Program. First Start may duplicate and conflict with this effort.
Veto number three was directed at the following language in the Act:

 Specific Appropriation 749
 749 Expenses
 From General Revenue Fund ............... 60,170
 From Bureau of Aircraft Trust
 Fund ............................... 1,381,194
 From Motor Vehicle Operating
 Trust Fund ......................... 1,157,970
 From State Infrastructure Fund ......... 74,600

The Governor's Veto Message contained the following relevant statement:
Appropriation 749 on page 145 from the State Infrastructure Fund to provide expenses for the Division of Motor Pool is hereby vetoed. With the reduction of the State Infrastructure Fund from $500 million to $350 million, it is vital that the projects funded from this source be only the most critical priorities of the State, such as constructing correctional and public facilities and protecting the State's environmental resources.
Veto number four was directed at the following language in the Act:

 Specific Appropriation 956
 956 Special Categories
 Start-Up Funds/Group Fund
 From General Revenue Fund ..................... 80,000
 From Intermediate Care Facilities/Mentally
 Retarded/Group Living
 Home Revolving Trust Fund ................... 80,000

The Governor's Veto Message contained the following statement:
Appropriation 956 on page 184 appropriating $80,000 from the General Revenue Fund for Group Home Loans is hereby vetoed. Funding for this program is available in the Community Residential Training Category.
Veto number five was directed at the following proviso language in the Act:
Upon termination of employees in the Senior Management Service, Selected Exempt Service, or positions with comparable benefits, payments for unused annual leave credits accrued on the member's last anniversary date shall be prorated at the rate of one-twelfth (1/12) of the last annual amount credited for each month, or portion thereof, worked subsequent to the member's last anniversary date.
The Governor's Veto Message contained the following relevant statement:
Proviso language in Section 1.1.5., paragraph 4, on page 296, authorizing funds to be used for purposes other than for the payment for unused annual leave credits for employees in the Senior Management Service and Selected Exempt Service, is hereby vetoed, and no funds provided in any agency budget, to the extent they are identified by this language, shall be utilized for such purposes. Limiting this benefit would not only impair the contract the State has with its present senior-level managers, but also would seriously undermine State government's ability to attract other high level senior managers.
*842 Veto number six was directed at the following language in the Act:

 Specific Appropriation 1539
 1539 Lump Sum
 Senate
 From General Revenue Fund ... 22,838,383
 ... .

The Legislature may pay, from funds appropriated to the legislative branch, the reasonable costs that are incurred by members or employees of the legislature in excess of the level of benefits available under the state health plan for alcohol dependency treatment and rehabilitation programs.
The Governor's veto message contained the following relevant language:
Proviso language in the third paragraph following Appropriation 1539 on page 248 and $1 from the General Revenue Fund to allow members or employees of the legislative branch additional benefits for the treatment of alcohol dependency is hereby vetoed. This proviso language would permit unequal treatment of State employees and officials in regard to their health insurance since only members or employees of the legislative branch would be eligible for the additional benefits.
Veto number seven was directed at the following portion of the Act:

 Specific Appropriation 1578
 1578 Other Personal Services
 From General Revenue Fund ... $3,113,503
 From Forfeited Property Trust
 Fund ......................... 333,444
 From Internal Improvement
 Trust Fund ................... 970,752

Funds in Specific Appropriation 1578, include $455,000 from the General Revenue Fund for a feasibility and needs assessment study to be conducted by the Florida Resources and Environmental Analysis Center of Florida State University concerning the implementation of a statewide Geographic Information System. The study shall be completed and its results reported to the Speaker of the House of Representatives and to the President of the Senate no later than December 31, 1990. In addition, an interim report shall be provided to the Speaker and the President no later than March 15, 1990. The study shall include but not be limited to an assessment of short and long term implementation costs and objectives, impact and effects on local governments and appropriate state agencies, staffing and training requirements, technical specifications, and a timetable for implementation.
The Governor's Veto Message contained the following relevant statement:
Appropriation 1578 and associated proviso language on pages 253 and 254 appropriating $3,113,503 from the General Revenue Fund for modernization of State land records and a feasibility and needs assessment study by Florida State University concerning the implementation of a statewide Geographic Information System is hereby vetoed. The Department of Natural Resources' Legislative Budget Request stated that the modernization project would be done in three phases at a total cost of $8.1 million. With the $959,600 appropriated for this project in Fiscal Year 1988-89, the Department contracted with Florida State University to conduct a needs assessment to determine the scope of the project, design the project, and complete a pilot demonstration project. The needs assessment, dated May 5, 1989, reveals that the total project is estimated to cost $32,315,000, and will take eleven years to complete. Before any further State funds are appropriated for this purpose, the Trustees of the Internal Improvement Trust Fund and the Legislature should thoroughly review the proposed scope and timing of the project to determine if it is in the best interest of the State. If it is determined that such a project is warranted, it should be funded from trust funds set aside for land management purposes, and competitively bid to allow participation from the private and public sector. The proviso language appropriates $455,000 for a feasibility and needs assessment study which is duplicative of the purpose of the Growth Management Date [sic] Network Coordinating Council created in section 282.043, Florida Statutes. The Council, composed of nine State agencies, is charged by statute with developing criteria, policies and procedures *843 for the prescribed and preplanned transmission of growth management data among State and local agencies. In an October 1988 report adopted by the Governor and Cabinet, the Council specified procedures which are being implemented to develop a Statewide Geographic Information System.

II.
Initially, the Governor challenges the standing of petitioners to bring this action in their capacities as officers of the Florida House of Representatives. However, the Governor does not contend that petitioners lack standing to raise this question individually, in their capacities as taxpayers of the state. Unquestionably they do. Brown v. Firestone, 382 So.2d 654, 662 (Fla. 1980). Accordingly, the present petition is properly before this Court.

III.
The substantive issues raised by the parties involve the interpretation of article III, section 8(a) of the Florida Constitution, which provides in pertinent part:
The governor may veto any specific appropriation in a general appropriation bill, but may not veto any qualification or restriction without also vetoing the appropriation to which it relates.
In the past, we have attempted to delineate the scope of this constitutional restriction on the Governor's veto power. In Brown, for instance, we began with the following proposition:
[T]he veto power is intended to be a negative power, the power to nullify, or at least suspend, legislative intent. It is not designed to alter or amend legislative intent.

382 So.2d at 664 (emphasis added). Elaborating on this point, we stated:
If the legislature makes a specific appropriation, even if it be substantial, and if the legislature attaches a rationally and directly related qualification or restriction to that appropriation, then [the Constitution] requires the governor to make the hard choice whether to give up the appropriation entirely or to follow the legislative direction for its use.
Id. at 667. Thus, under the Florida Constitution, the veto power does not embrace authority to nullify a qualification or restriction unless the Governor simultaneously nullifies the related fund of money. Art. III, § 8(a), Fla. Const.
Perhaps the most difficult issue raised by the constitutional restriction, however, is the exact meaning of the term "specific appropriation." In attempting to resolve this question, we adopted the following rule in Brown:
A specific appropriation is an identifiable, integrated fund which the legislature has allocated for a specified purpose.
Brown, 382 So.2d at 668. This rule, while simple in theory, has been somewhat more difficult to apply in actual practice. The present controversy shows that it now needs refinement.
As is obvious from a review of recent appropriations laws, the legislature frequently appropriates large sums of money under a vague or broad line-item category and then specifies in proviso language the precise way this money may be spent. The problem is to determine when this proviso language has identified a sum of money and its purpose with sufficient definiteness that the language has become a "specific appropriation" within the meaning of the constitution.
There is no problem when proviso language expressly breaks the line item into a definite unit intended for a stated purpose. Such a proviso for all practical purposes constitutes a specific appropriation, as we stated in Brown. This is a necessary conclusion. If we were to adopt a rule that forbade the Governor to veto such proviso language, then the legislature easily could construct a "veto-proof" appropriations act merely by hiding the actual appropriations inside a mass of proviso language appearing under a few vague line items. Such a result would violate the intent of the framers in adopting article III, § 8(a), and would seriously diminish the executive's powers.
*844 At the other extreme, however, is proviso language that does not identify a sum of money at all, but merely specifies that some unidentified portion of the line item shall or may be used for particular purposes. Such proviso language lies at the very heart of the legislative power to appropriate funds, as representatives of the people, and to attach qualifications to the use of those funds. Permitting the Governor to veto language of this type would rob the legislature of its authority.
Both of these extremes must be avoided.

IV.
We have no doubt that vetoes one, five and six quoted earlier in this opinion are unconstitutional under the analysis we have just surveyed. The Governor conceded as much in oral argument.
Veto number one was directed at proviso language authorizing the Attorney General to exceed the maximum pay grade for eight specific employee positions. No sum of money is identified anywhere in the proviso itself or elsewhere in the Act. Nevertheless, the Governor unilaterally has assigned a value of $361,070 to this proviso and argues in his response that he thus has "sought to identify the funds attributable to that proviso as directed by this Court's decision in Brown v. Firestone."
However, nothing in Brown authorizes the Governor to assign value to a proviso if the legislature itself has not done so. Investing the Governor with this power would permit him to fabricate an "integrated fund" out of virtually any proviso or portion of a proviso merely by supplying his own "estimate" of its monetary cost. This would intrude too greatly upon the legislative prerogative, no matter how accurate the Governor's monetary estimate might be. We thus conclude that, before the Governor may veto specific proviso language, that language on its face must create an identifiable integrated fund  an exact sum of money  that is allocated for a specific purpose. The proviso in veto number one does not meet this test, and the veto thus fails.[*]
Similarly, veto number five was directed at a proviso establishing conditions under which certain workers will be paid for unused annual leave credits on termination. This proviso does not identify an exact sum of money, nor does the Governor attempt to disclose such a sum in his Veto Message. Accordingly, this veto fails under the analysis in Brown.
Veto number six was directed at a proviso creating special benefits for the treatment of alcohol dependency for members and employees of the legislature. The Governor's Veto Message vetoes the proviso "and $1 from the General Revenue Fund." Again, this appears to be an impermissible attempt, however unrealistic, to estimate the value of the proviso language. The Governor now concedes in his response that "he failed to veto the funds to which the proviso language relates." Indeed, he could not have done so, since the proviso itself specifies no such sum. Accordingly, this veto also fails.

V.
Veto number two involves proviso language creating an appropriation totaling $4,000,000, which was further divided into two separate units. The first of these units consisted of $100,000 expressly earmarked for the Toddler Intervention Program in Dade County. The second consisted of the remainder of the appropriation  or $3,900,000  expressly earmarked for the Florida First Start Program. The Governor's Veto Message by its plain language sought to eliminate the latter but not the former.
We believe this is an acceptable exercise of the veto power. Although the figure $3,900,000 does not expressly appear in the Act, that sum nevertheless is unquestionably the amount appropriated for the Florida First Start program. The elements required *845 by Brown  an integrated identifiable fund allocated for a specified purpose  clearly exist on the face of the Act. Accordingly, the Governor's veto of this $3,900,000 appropriation will be sustained.

VI.
The next group of vetoes  numbers three, four and seven  share a common characteristic. In each of these, the Governor did not veto the entire sum of money appropriated for a single stated purpose in the line item. Rather, he vetoed only those portions that had been appropriated from specific funding sources. In each instance, the Act provided an exact sum of money that would be taken from each of these funding sources. And in each instance, money derived from other funding sources was not vetoed, thus leaving the line item partially funded.
Veto number three, for instance, was directed at $74,600 taken from the State Infrastructure Fund. This $74,600 was one of four separate funding sources designated to be used for expenses of the Division of Motor Pool. The Governor's Veto Message stated that it was inappropriate to use these Funds for this particular purpose, although he acquiesced to funding derived from the other three sources.
Veto number four was directed at $80,000 taken from the General Revenue Fund to be used as start-up funds for group homes. The Governor left intact a separate $80,000 sum taken from another fund to be used for the same purpose. In his Veto Message, the Governor stated that funding for this program was available from other sources.
Similarly, veto number seven was directed in part at $3,113,503 taken from the General Revenue Fund to pay for Other Personnel Services for the Department of Natural Resources. However, two other funding sources for this line item remained intact. Although the Act itself does not provide any more precise purpose, the Governor's Veto Message stated that at least some of this money would be used to modernize state land records  a purpose to which he objected.
The Governor now argues that these vetoes must be sustained because they were directed at identifiable sums of money allocated for a specific purpose. Petitioners argue that this is not a proper interpretation of Brown.
We agree with petitioners. The Governor's veto powers must be interpreted in light of the policies underlying Florida's doctrine of separation of powers. See Art. II, § 3, Fla. Const. The constitution commands not merely that there must be three branches of government, but that "[n]o person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." Id. In light of this strong policy, we believe the veto power must be construed in such a way as to maintain the vigor of the legislative branch, and that the legislative power must be construed so as to preserve the viability of the executive. We must strike a balance.
It now is well settled that the veto power may be used only to nullify or suspend, not to reduce or modify an appropriation. Brown. What the Governor requests is little different than the power to reduce. In each of the line items at issue here, the legislature has identified only one purpose, which will be achieved with sums taken from several separate funding sources. The Governor argues essentially that we must consider each of these sources to be a "fund" subject to veto. We, however, believe that the existence of such a fund cannot be determined solely by reference to the fact that a specific sum is stated in the Act itself. There also must be consideration of the legislature's purpose.
While the definition of "specific appropriation" contained in Brown did not directly address the issue presented by vetoes three, four, and seven, the requirement of an "integrated fund" mandates the result we reach today. See Brown. In a practical sense, a fund is not "integrated"  it is not a "specific appropriation"  unless it consists of all those elements necessary to achieve the stated purpose. This is true even if those individual elements are precise *846 sums of money taken from different funding sources. If the legislature's purpose is to expend a specific amount of money for a single stated purpose, then the Governor has no authority to reduce that amount by vetoing one of several funding sources. The Governor must veto all or none.
Any requirement less than this would seriously erode the legislature's power to decide the level of appropriations. Permitting the vetoing of individual funding sources comes too close to authorizing the Governor to reduce appropriations. We thus conclude that vetoes number three and four fail, and that veto number seven fails to the extent it attempts to eradicate the $3,113,503 funding source. Art. II, § 3, Fla. Const.; Art. III, § 8, Fla. Const.

VII.
Finally, veto number seven also was directed at a proviso specifying that $455,000 be used to study the need for a statewide Geographic Information System. Petitioners in their brief have conceded that the proviso setting aside $455,000 was subject to the line-item veto. However, they apparently argue that the entire veto must fail because of the impropriety in vetoing the $3,113,503 funding source, which we have analyzed above. The Governor on the other hand argues that the only issue before this Court is the propriety of vetoing the funding source itself.
We agree with the Governor. Read in its totality, the Veto Message indicates that veto number seven was directed at two distinct elements of the Act: the eradication of the $3,113,503 funding source and the $455,000 appropriated for a study of a Geographic Information System. The two are not so closely related as to be inseparable. We thus are inclined to treat veto number seven as two separate vetoes inartfully combined into one. On that basis and in light of petitioners' concession, we conclude that veto number seven is valid solely to the extent that it disapproved the $455,000 study.

VIII.
For the foregoing reasons, we grant in part and deny in part petitioners' request for a writ of mandamus. On the date this opinion becomes final, the Secretary of State shall expunge from the official records of the state those vetoes found to be improper in this opinion, and the Governor and Comptroller shall take all actions necessary to ensure that these expunctions are reflected in the financial operations of the state. Trusting that respondents will fully comply with the views expressed in this opinion, we withhold issuance of the writ.
It is so ordered.
EHRLICH, C.J., and OVERTON, SHAW and BARKETT, JJ., concur.
McDONALD, J., concurs in part and dissents in part with an opinion.
GRIMES, J., concurs in part and dissents in part with an opinion.
McDONALD, Justice, concurring in part and dissenting in part.
In this action members of the House of Representatives seek a writ of mandamus to compel the Secretary of State to expunge vetoes of the Governor from the official records of the state and to direct the Comptroller to take appropriate actions with such order. The petitioners contend that seven gubernatorial vetoes pertaining to the General Appropriations Act of 1984, Senate Bill 1500, are invalid. The Secretary of State and the Comptroller take no position of the claims; the Governor argues that the vetoes should be sustained, or, in the alternative, certain proviso language in the appropriation act should be stricken as unconstitutional.
Vetoes number one, five, and six can and should be reviewed together. These three vetoes clearly do not challenge "specific appropriations" as that term is used in article III, section 8 of the Florida Constitution. Article III, section 8 provides in pertinent part: "The governor may veto any specific appropriation in a general appropriation bill, but may not veto any qualification or restructuring without also vetoing *847 the appropriation to which it relates." In Brown v. Firestone, 382 So.2d 654 (Fla. 1980), we defined "specific appropriation" which is subject to veto as follows:
In the context of a qualification or restriction, a specific appropriation is the smallest identifiable fund to which a qualification or restriction is or can be directly and logically related. In practical effect this means that in most cases where a qualification or restriction includes the setting apart of an identifiable sum of money, that fund will be considered a specific appropriation, since it will most likely be the smallest identifiable fund to which the qualification logically relates.
Id. at 668 (emphasis supplied). In Martinez v. The Florida Legislature, 542 So.2d 358 (Fla. 1989), we again recited this definition and further stated:
If a qualification or restriction in an appropriations bill sets apart an identifiable sum of money, that fund will be considered to be a specific appropriation because "it will most likely be the smallest identifiable fund to which the qualification logically relates." We held that "[i]f the legislature deems it wise to appropriate a specific fund in a qualification or restriction, then the governor will be able to veto that qualification as a specific appropriation, just as he could have done had the legislature listed the fund as a separate line item."
Id. at 360 (quoting Brown, 382 So.2d at 668).
The legislature's provisos referred to in the Governor's vetoes one, five, and six do not comport with this definition. They do not refer to an identifiable sum. The Governor's concerns over the constitutionality or wisdom of such provisions cannot be reached by the use of veto. Brown. The Governor's remedies are limited to vetoing the entire item to which such refers or seeking a declaration in the courts in reference thereto.
The appropriation which was the subject of veto number three designated $74,600 for expenses to be derived from infrastructure funds. In Brown we considered proviso language, while here we consider the effect of a directive that a specified amount of money come from a particular funding source to be spent for a specified purpose. An appropriation designating that X amount of dollars are appropriated for a designated purpose, but that Y dollars shall be derived from source Z, has the constitutional equivalency of saying that X number of dollars are appropriated, but, of that amount, Y number of dollars shall be spent in a designated manner. Each is a clearly defined fund and specifically referenced. Under Brown the sum of $74,600 was a specific line item separated from the other funds. Because it was a specific appropriation, the Governor could veto it.
Veto number four is similar. A segregated line item appropriation of $80,000, to be derived from a particular revenue source, was vetoed. This appropriation was clearly identified and subject to veto.
Veto number seven was more substantial in terms of dollars. The sum of $3,113,503 for Other Personnel Services was specifically appropriated. The Governor vetoed it and stated his reason. The fact that he did not veto the line items of $332,444 and $970,752 should not affect his veto of the line item of $3,113,503.
Veto number two is in a little different posture. The Governor's veto message on this item is somewhat confusing in that it is not clear whether the $4,000,000 appropriation was to be vetoed, or whether $3,900,000 of that amount was the subject of veto. Because the $4,000,000 contained a proviso that $100,000 would be used for a specific purpose, the petitioners contend that the Governor could veto the $4,000,000 or the $100,000, but not $3,900,000. Reading the veto message in its totality, I believe the clear intent of the Governor was to veto the entire $4,000,000. I also believe, however, that because the $100,000 proviso created a lesser identifiable sum, it would not be improper to veto the $3,900,000 of the $4,000,000 fund. My colleagues would give the benefit of doubt on whether the veto was for $4,000,000 or for $3,900,000 to the legislature and uphold the *848 $3,900,000 veto only. I am content with this.
In summary, I would rule invalid the vetoes of items one, five, and six, but uphold the vetoes on items three, four, and seven. On veto number two, I would sustain the $4,000,000 veto except for $100,000 for the Toddler Intervention Program (TIP) in Dade County.
GRIMES, Justice, concurring in part, dissenting in part.
I agree that the governor could not legally exercise vetoes numbered one, five, and six for the reasons expressed in the majority opinion. If the governor believes that the appropriations to which these vetoes were directed are unconstitutional, his recourse lies in the filing of a suit for declaratory decree in circuit court. Brown v. Firestone, 382 So.2d 654 (Fla. 1980). I also agree that the governor could legally exercise veto number two directed to $3,900,000 appropriated for the Florida First Start program.
The legality of vetoes number three, four, and seven essentially depends upon the definition of appropriation. In Brown, we said:
A specific appropriation is an identifiable, integrated fund which the legislature has allocated for a specified purpose.
382 So.2d at 668. The appropriations which were the subject of vetoes three, four, and seven meet this definition. The majority has mistakenly read into the definition a proviso that no other funds may be appropriated for the same purpose.
For example, no one could dispute the validity of veto number three if the appropriation from the State Infrastructure Fund of $74,000 stood alone as the appropriation for expenses of the Division of Motor Pool. The fact that monies are appropriated from other funds also to pay expenses of the Division of Motor Pool does not have the effect of causing the separate line item of $74,600 to be lumped into the other appropriations. The fallacy of the legislature's position on this point becomes particularly clear when it is noted that the total expenses of $2,673,934 appropriated for the Division of Motor Pool does not even appear in appropriation 749. Rather, the four funding sources from which the monies are appropriated are listed as separate line items.
The same rationale applies to vetoes four and seven. Accordingly, I would also uphold vetoes three, four, and seven.
NOTES
[*] The Governor also argues that this and several other provisos violate constitutional restrictions on the legislature's powers. This is a matter not properly before this Court in the present petition, and we thus do not consider the issue.