SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| KEN BENNETT, President, Arizona State Senate; FRANKLIN "JAKE" FLAKE, Speaker, Arizona House of Representatives; TIMOTHY BEE, Majority Leader, Arizona State Senate; EDDIE FARNSWORTH, Majority Leader, Arizona House of Representatives, | ) ) ) ) ) ) ) ) | |
| Petitioners, | ) ) | Arizona Supreme Court No. CV-03-0245-SA |
| v. | ) ) | |
| JANET NAPOLITANO, Governor of the State of Arizona; ARIZONA DEPARTMENT OF ADMINISTRATION and BETSEY BAYLESS, Director; GENERAL ACCOUNTING OFFICE of the Arizona Department of Administration; D. CLARK PARTRIDGE, Arizona State Comptroller; ARIZONA DEPARTMENT OF AGRICULTURE and JACK PETERSON, Director; ARIZONA DEPARTMENT OF ECONOMIC SECURITY and WILLIAM BELL, Acting Director; ARIZONA DEPARTMENT OF HEALTH SERVICES and CATHERINE R. EDEN, Director; ARIZONA STATE LAND DEPARTMENT and MARK WINKELMAN, Commissioner; ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM and C.J. HINDMAN, Acting Director; ARIZONA DEPARTMENT OF EDUCATION and TOM HORNE, Superintendent; and ARIZONA STATE PARKS BOARD, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **O P I N I O N** |
| Respondents. | ) ) ) ) | |
| _____ | ) | |

Special Action

JURISDICTION ACCEPTED; RELIEF DENIED
_____

SNELL & WILMER L.L.P.                                    Phoenix
    by   John J. Bouma
         Andrew F. Halaby
         Danielle J. Malody
         Jeffrey C. Warren
Attorneys for Petitioners

Office of the Governor                                   Phoenix
    by   Timothy A. Nelson, General Counsel
         Nicole D. Davis, Deputy General Counsel
    and
LEWIS AND ROCA LLP                                       Phoenix
    by   Scott Bales
         Kimberly A. Demarchi
Attorneys for Governor Napolitano

TERRY GODDARD, Attorney General                          Phoenix
    by   Mary O'Grady, Solicitor General
Attorneys for Respondent State Agencies
and Related Officials

Logan T. Johnston, III                                   Phoenix
Attorneys for AHCCCS and C.J. Hindman

Arizona Center for Law in the Public Interest            Phoenix
 by  Timothy M. Hogan
Amicus Curiae for School Finance Reform Group

_____


**J O N E S, Chief Justice**

## I.  INTRODUCTION

¶1       On June 12, 2003, the legislature enacted and transmitted to the governor four bills comprising the state's operating budget for fiscal year 2004 -- the general appropriations bill (House Bill 2531) and three omnibus reconciliation bills (ORBs) consisting of the Public Finance ORB (House Bill 2533), the Education ORB (House Bill 2534), and the Health and Welfare ORB (House Bill 2535).

¶2       On June 17, 2003, the governor item vetoed some thirty-five

separate provisions from the four bills, and, as required, sent a message to both legislative chambers stating the reasons for her vetoes. Ariz. Const. art. V, § 7. On June 19, 2003, with no further action on the vetoed items, the legislature adjourned *sine die*.

¶3        On July 15, 2003, petitioners -- state legislators Ken Bennett, President of the Senate, Franklin "Jake" Flake, Speaker of the House of Representatives, Timothy Bee, Senate Majority Leader, and Eddie Farnsworth, House Majority Leader -- brought this special action challenging the governor's use of the item veto in twelve specified instances and alleging, as to each, that the governor exceeded her veto authority under the Arizona Constitution. On September 4, 2003, petitioners withdrew their challenge to one of the twelve vetoes, leaving eleven.

**A.    The Provisions Vetoed**

¶4        Of the eleven vetoes challenged, nine involved provisions in the general appropriations bill, and two pertained, respectively, to provisions in the Education and the Health and Welfare ORBs.

**1.    The General Appropriations Bill**

**a.    Fixed Lump Sum Reductions**

¶5        In separate appropriations to five governmental departments in the general appropriations bill, the legislature provided in each instance (a) a single operating allocation, (b) various specifically directed allocations in smaller amounts, and (c) a separate "lump sum reduction." In each appropriation, the lump sum reduction required

the particular department to reduce overall spending by a specified sum.[1]  The governor item vetoed each of the five lump sum reductions.[2]

### b.    Other Reductions

¶6        The sixth, seventh, and eighth item vetoes directed at the general appropriations bill also involved reductions in funding.  In the appropriation to the Department of Health Services, the legislature imposed a $10,000,000 reduction labeled an "offset for receipts."  2003 Ariz. Sess. Laws, ch. 262 § 44.  The governor vetoed the offset.

¶7        In the appropriation to the Department of Economic Security, the legislature imposed a $14,906,000 reduction for

---

[1]      The spending reductions for the five departments were ordered as follows:    $531,600 from the Department of Administration, 2003 Ariz. Sess. Laws, ch. 262, § 4; $566,700 from the Department of Agriculture, *id.* § 6; $1,007,500 from the Department of Economic Security, *id.* § 29; $2,524,500 from the Department of Health Services, *id.* § 44; and $125,000 from the State Land Department, *id.* § 54.

[2]      For example, after the governor's veto, the appropriation to the Department of Agriculture appeared as follows:

| Sec. 6 | DEPARTMENT OF AGRICULTURE | |
|---|---|---|
| | | 2003-04 |
| | FTE positions | 250.2 |
| | Operating lump sum appropriation | $12,436,700 |
| | Agricultural employment relations board | 23,300 |
| | Animal damage control | 65,000 |
| | Red imported fire ant | 23,200 |
| | ~~Lump sum reduction~~ | ~~566,700~~ |
| Total appropriation -- department of | | |
| | agriculture | $11,981,500 |

The appropriations to the other four departments were of similar form and appearance following the vetoes.

-4-

"federal match rate savings."  The legislature explained this provision:

> The reduction associated with the federal match rate change represents a reduction in the state general fund appropriation associated with temporary changes to the federal matching assistance percentage designed to give fiscal relief to states.  There shall be a corresponding $14,906,000 increase in federal expenditure authority to the department.

*Id.* § 29.  The governor vetoed the match rate savings reduction.

¶8        In the appropriation to the Department of Health Services, the legislature imposed a contingency reduction to be taken from the allocated funds pursuant to the following formula:

> If the department receives more than $1,188,000 in federal 317 monies for vaccines purchase for state fiscal year 2003-2004, the state general fund amount of the state fiscal year 2003-2004 appropriation for the vaccines special line item equal to the amount by which the federal monies exceed $1,188,000 up to $576,000 shall revert to the state general fund.

*Id*. § 44.  The governor vetoed the contingency reduction.

### c.    Arts Commission Funding

¶9        The ninth and final item veto within the general appropriations bill involved an appropriation of $1,800,000 to the Arizona Commission on the Arts.  *Id.* § 9.  With this appropriation, the legislature identified the Heritage Fund as the source of the funds.  *Id.*    The governor vetoed the source but left the appropriation intact and asserted that, in the absence of a source of monies, the $1,800,000 would be disbursed from the state general fund.  Petitioners challenge the veto, claiming the governor lacked

authority to direct monies from the general fund to the Arts Commission.

## 2. The Omnibus Reconciliation Bills (ORBs)

### a. The Education ORB

¶10    The tenth item veto was directed at the Education ORB in which the legislature ordered a fifty percent reduction in the amount of "rapid decline" funding a school district is eligible to receive. 2003 Ariz. Sess. Laws, ch. 264, § 40.  The governor vetoed the reduction.

### b. The Health and Welfare ORB

¶11    The eleventh item veto was directed at the Health and Welfare ORB in which the legislature amended Arizona Revised Statutes section 36-2907 to remove adult emergency dental care from coverage under the Arizona Health Care Cost Containment System.  2003 Ariz. Sess. Laws, ch. 265, § 21.  The governor vetoed the amendment.

### c. The Public Finance ORB

¶12    Petitioners also raise an issue relating to the Public Finance ORB which, among other things, appropriated $75,000,000 to be used as partial reimbursement due a class of Arizona taxpayers, pursuant to the settlement of a judicial matter.[3]  2003 Ariz. Sess. Laws, ch. 263, § 69.  The governor vetoed the appropriation, causing the monies to remain in the general fund.  Petitioners concede the

---

    [3]    *See Ariz. Dep't of Revenue v. Dougherty*, 200 Ariz. 515, 29 P.3d 862 (2001).

-6-

validity of this veto but claim the language in the governor's veto message will authorize future spending not approved by the legislature.[4]

## B. Jurisdiction

¶13 The Arizona Constitution gives the governor two distinct veto powers: (a) a general power, which allows veto of an entire bill on any subject, and (b) a line item power, which authorizes the governor to veto "one or more" items of appropriation in "any bill" that contains "several items of appropriations." Ariz. Const. art. V, § 7.

¶14 Petitioners claim the eleven vetoed items were not appropriations.[5] They urge that we hold the vetoes unconstitutional and that we order the governor and all affected state officers and departments to implement the legislature's budget package without regard to the vetoes. This court has original jurisdiction over the issuance of extraordinary writs against state officers. Ariz. Const. art. VI, § 5(1); *see also Rios v. Symington*, 172 Ariz. 3, 833 P.2d 20

---

[4]    Special action jurisdiction is not appropriate to review the language used by the governor in the veto message; it will be appropriate to consider the issue only if and when the executive branch of government undertakes spending to which an objection is properly made.

[5]    An appropriation is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other." *Rios v. Symington*, 172 Ariz. 3, 6, 833 P.2d 20, 23 (1992) (quoting *Hunt v. Callaghan*, 32 Ariz. 235, 239, 257 P. 648, 649 (1927) (citations omitted in *Rios*)).

(1992).

¶15      We accept jurisdiction of the petition.  We conclude, however, without reaching the merits, that two threshold questions determine the outcome of this case:  first, whether the petitioners have demonstrated facts sufficient to achieve requisite standing to maintain the action; and second, whether prudential concerns dictate the exercise of judicial restraint such that the court should abstain from consideration of the dispute.

## II. DISCUSSION

**A.    Standing**

¶16      This court has, as a matter of sound judicial policy, required persons seeking redress in the courts first to establish standing, especially in actions in which constitutional relief is sought against the government.  *Sears v. Hull*, 192 Ariz. 65, 71, 961 P.2d 1013, 1019 (1998).  In *Sears*, we denied standing to citizens seeking relief against the governor because they failed to plead and prove palpable injury personal to themselves.  *Id*. at 69-70, 961 P.2d at 1017-18.  A contrary approach would inevitably open the door to multiple actions asserting all manner of claims against the government.

¶17      In the federal courts, standing requirements are firmly rooted in Article III of the U.S. Constitution.  Indeed, the founders, at the constitutional convention of 1787, circumscribed federal jurisdiction carefully with the requirement that matters

brought before the courts must constitute real "cases or controversies." *See* U.S. Const. art. III, § 2, cl. 1. In short, cognizable injury personal to those seeking redress would have to be shown. The case or controversy requirement provides clear recognition of the separation of powers principle that was central to the creation of our national government. *See* The Federalist No. 78 (Alexander Hamilton); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984). To ensure separation of the powers of government under the U.S. Constitution, federal courts have consistently established doctrines "founded in concern about the proper -- and properly limited -- role of the courts in a democratic society." *Allen*, 468 U.S. at 750 (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)).

¶18 The federal standing doctrine requires that a court refrain from addressing a case on its merits unless the parties can assert facts that give rise to an actual case or controversy. It is "perhaps the most important of [the Article III] doctrines." *Id.* To establish federal standing, a party invoking the court's jurisdiction "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 751.

¶19 Article VI of the Arizona Constitution, the judicial article, does not contain the specific case or controversy requirement of the U.S. Constitution. But, unlike the federal constitution in which the separation of powers principle is implicit,

our state constitution contains an express mandate, requiring that the legislative, executive, and judicial powers of government be divided among the three branches and exercised separately.[6] This mandate underlies our own requirement that as a matter of sound jurisprudence a litigant seeking relief in the Arizona courts must first establish standing to sue.

¶20 Concern over standing is particularly acute when, as here, legislators challenge actions undertaken by the executive branch. Without the standing requirement, the judicial branch would be too easily coerced into resolving political disputes between the executive and legislative branches, an arena in which courts are naturally reluctant to intrude. *See, e.g.*, *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.").

### 1. Standing as Legislators

¶21 Standing sought by legislators in an action against the governor is an issue of first impression in Arizona. In *Rios*, 172

---

[6] Article III of the Arizona Constitution provides:

The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; and, except as provided in this constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

Ariz. 3, 833 P.2d 20, a case in which a legislator challenged a number of item vetoes by the governor, this court accepted jurisdiction and decided the case. There, however, the governor did not raise the standing question, and, because courts traditionally do not address issues not properly raised, we declined, albeit reluctantly, to address "potential standing issues." *Id*. at 5 n.2, 833 P.2d at 22 n.2. By contrast, in the case before us, the standing question has been squarely raised by the governor and addressed in reply by the petitioners.

¶22 Although we are not bound by federal jurisprudence on the matter of standing, we have previously found federal case law instructive. *See Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 148 Ariz. 1, 6, 712 P.2d 914, 919 (1985). Of particular relevance is *Raines v. Byrd*, the Supreme Court's most recent opinion on whether legislators have standing to sue the executive branch. 521 U.S. 811.

¶23 *Raines* involved six members of Congress who brought suit in federal court challenging the constitutionality of the Line Item Veto Act, which authorized the President to cancel certain spending provisions while signing other provisions into law. *Id*. at 814. Any provision that might be vetoed by the President remained subject to override by a two-thirds vote of the Congress. *Id*.

¶24 The six plaintiffs, having voted against the Act, argued that the Act infringed on the legislative power granted in Article I

of the U.S. Constitution.  *Id*. at 816.  They claimed standing on the basis that the Act reduced the "effectiveness" of their votes and injured them in their official capacity as members of Congress.  *Id*.  The Supreme Court rejected the argument, holding that the members lacked standing to maintain the action because their alleged injury was not "particularized" to the individual claimants and was not sufficiently "concrete" to justify judicial intrusion into a dispute between the legislative and executive branches.  *Id*. at 829.  The Court reasoned that the injury alleged was "based on a loss of political power, not loss of any private right," and therefore the members suffered no injury personal to themselves.  *Id*. at 821.  In addition, the Court pointed out that the injury claimed was, at most, an institutional injury and that the six members had not been authorized to sue on behalf of their respective chambers of the Congress.  *Id*. at 829.

¶25      In reaching its conclusion, the Supreme Court distinguished a prior legislative standing case, *Coleman v. Miller*, 307 U.S. 403 (1939), urged as authority by the six members of Congress, as well as by the petitioners in the instant case.  In *Coleman*, twenty of forty Kansas state senators in 1937 voted against ratification of the proposed Child Labor Amendment to the U.S. Constitution.  *Id*. at 435-36.  The other twenty voted for the Amendment.  *Id*.  The tie vote would mean that ratification had failed in Kansas.  Seeking to avoid failure, Kansas' lieutenant governor broke the deadlock by providing

the twenty-first vote in the legislature in favor of ratification. The twenty opposing senators, joined by a twenty-first, brought suit challenging the lieutenant governor's action as unconstitutional. *Id.* at 436. On the matter of standing, the Supreme Court found that if the allegation were true, the senators' "votes against ratification [had] been overridden and virtually held for naught although . . . their votes would have been sufficient to defeat ratification." *Id.* at 438. The twenty senators' negative votes had thus been nullified by illegal interference within the legislative process. *Id.* at 446. Distinguishing *Coleman*, the Supreme Court in *Raines* found the facts to be quite different. Most importantly, the votes of the six *Raines* plaintiffs were not nullified by improper action in the Congress; rather, they were fully counted as valid but were simply insufficient in number to defeat the Act. 521 U.S. at 824.

¶26 Similarly, in the case before us, no legislator's vote was nullified by interference in the legislature. All votes were counted, and the budget bills were enacted. The bills were transmitted to the governor in the normal course. Once enacted, as in *Raines* but contrary to *Coleman*, legislative action on the bills was complete.

¶27 Further explaining the distinction in *Coleman*, the Supreme Court responded to the argument that the President's veto power unconstitutionally canceled the members' votes:

-13-

> Even taking [the members of Congress] at their word about the change in the "meaning" and "effectiveness" of their vote for appropriations bills which are subject to the Act, we think their argument pulls *Coleman* too far from its moorings. [The members'] use of the word "effectiveness" to link their argument to *Coleman* stretches the word far beyond the sense in which the *Coleman* opinion used it. There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here. To uphold standing here would require a drastic extension of *Coleman*. We are unwilling to take that step.

*Id.* at 825-26.

¶28    Today's case resembles *Raines* more closely than it resembles *Coleman*. Under the *Raines* doctrine, "[t]he standing inquiry focuses on whether the plaintiff is the proper party" to bring suit, that is, whether a sufficient showing of particularized injury has been made. *Id.* at 818. Our four petitioners have shown no injury to a private right or to themselves personally and are thus in a position similar to the six members of Congress in *Raines*. Like the alleged injury in *Raines*, petitioners' injury is "wholly abstract and widely dispersed," and as such, is not sufficient to establish individual standing.

¶29    Nor can these four petitioners assert standing to litigate claims of injury to the legislature as a whole. The Supreme Court in *Raines* found it significant that the six plaintiffs "ha[d] not been authorized to represent their respective Houses of Congress in th[e] action." *Id*. at 829. In contrast, the twenty-one senators in *Coleman* constituted a majority of the Kansas Senate. Petitioners

-14-

here, consisting of four of ninety members of the legislature, have not been authorized by their respective chambers to maintain this action. When a claim allegedly belongs to the legislature as a whole, four members who bring the action without the benefit of legislative authorization should not, except perhaps in the most exceptional circumstances, be accorded standing to obtain relief on behalf of the legislature.

### 2. Standing as Taxpayers

¶30 We also reject petitioners' claim to standing as taxpayers. The petition before us makes no statement or allegation that petitioners filed the action in their capacity as taxpayers. The "taxpayer" argument was first raised in petitioners' reply brief, relying on *Ethington v. Wright*, 66 Ariz. 382, 189 P.2d 209 (1948). That case was advanced for the proposition that a taxpayer has standing to challenge the illegal expenditure of state funds. *Id*. at 387, 189 P.2d at 213. But *Ethington* allowed a taxpayer to challenge a legislative act that expended monies *for an unconstitutional purpose*. *Id.* at 394, 189 P.2d at 217. Petitioners here do not claim the funds affected by the vetoes are to be spent for an illegal or unconstitutional purpose; they challenge only the manner in which the governor's action affected proposed spending. Whatever the implications of *Ethington*, they do not reach the facts before us.

### B. Prudential Concerns

¶31 Because the Arizona Constitution does not contain a

-15-

provision analogous to the case or controversy requirement of the U.S. Constitution, "we are not constitutionally constrained to decline jurisdiction based on lack of standing." *Sears*, 192 Ariz. at 71, 961 P.2d at 1019. But even within the parameters of the state constitution, we have indicated a willingness to consider the merits of a case in the absence of a particularized injury "only in exceptional circumstances, generally in cases involving issues of great public importance that are likely to recur. The paucity of cases in which we have waived the standing requirement demonstrates both our reluctance to do so and the narrowness of this exception." *Id.* The following factors convince us that this is not the rare case in which waiver of standing is proper.

## 1. The Dispute Is Political

¶32    First, we are reluctant to become the referee of a political dispute. Even in *Rios*, where this court accepted jurisdiction in a setting in which legitimate standing issues were never raised, we "caution[ed] that [the court] did not do so lightly." We expressed concern that

> it would be a serious mistake to interpret our acceptance of jurisdiction in this cause as a general willingness to thrust the Court into the political arena and referee on an . . . [annual] basis the assertions of the power of the executive and legislative branches in the appropriations act. . . . [F]uture attempts to invoke this Court's jurisdiction on similar grounds will be viewed with great circumspection.

172 Ariz. at 5, 833 P.2d at 22 (quoting *Brown v. Firestone*, 382 So.

-16-

2d 654, 671 (Fla. 1980)).

¶33     Our general disinclination to enter political controversy is heightened by the fact that petitioners here, though leaders in their respective chambers, represent only four of ninety members of the legislature.

¶34     In addition, we attach significance to the legislature's failure to exercise available political means by seeking to override the governor's vetoes, a procedure permitted by Article V, § 7 of the state constitution.  Although the absence of an override attempt is not per se fatal to petitioners' argument that the court should waive the standing requirement, we note that had petitioners attempted the constitutional remedy available to them, the legislature would have been able to alleviate some of the court's concern that we ought not prematurely enter "the political arena [to] referee . . . the assertions of the power of the executive and legislative branches." *Id*. (quoting *Brown*, 382 So. 2d at 671).

## 2.   Method of Structuring Appropriations

¶35     We agree with the petitioners' argument that the legislature is free to structure appropriations in ways that it, alone, shall determine and to express in its own way the intent that underlies such measures.  We conclude, however, that the unusual method of legislative structuring used in the vetoed reductions at issue in the instant case is likely a non-recurring event.  Indeed, neither party has offered evidence that the manner of formatting

-17-

these reductions in the current budget cycle has ever before been utilized by the legislature. As a practical matter, the legislature may enact future appropriations in ways that avoid reductions as parts of the appropriation process.

### 3. The Single Subject Rule of Article IV

¶36      Finally, our decision to abstain from the merits of this case is in part predicated on the "single subject" rule of Article IV of the Arizona Constitution. The rule was conspicuously avoided by the parties in the instant dispute, but was raised in an *amicus curiae* brief filed with the court.

¶37      The rule requires that every act passed by the legislature "embrace but one subject and matters properly connected therewith." Ariz. Const. art. IV, pt. 2, § 13.[7] This rule, wisely placed, "was intended to prevent the pernicious practice of 'logrolling.'" *Kerby v. Luhra*, 44 Ariz. 208, 214, 36 P.2d 549, 551 (1934). A bill that deals with multiple subjects creates a serious "logrolling" problem because an individual legislator "is thus forced, in order to secure the enactment of the proposition which he considers the most important, to vote for others of which he disapproves." *Id*. at 214-

---

[7]      The single subject rule is also found in section 20 of Article IV, which requires all appropriations, other than those in the general appropriations bill, to "be made by separate bills, each embracing but one subject." Ariz. Const. art. IV, pt. 2, § 20.

15, 36 P.2d at 552.[8]

¶38    Moreover, single subject violations create a separate problem, equally serious, in connection with the governor's veto power.  A governor presented with a multi-subject bill inevitably faces a "Hobson's choice."  She must either veto the entire bill, including the measures she supports, or accept the entire bill, including the measures she opposes.  In addition, lumping multiple subjects in the same bill tends to undermine the legislative process by stifling valuable debate within government's most important forum of persuasion and policymaking, the legislature.

¶39    The issue is whether the governor is authorized to item veto provisions of the ORBs.  The problem arises because the relevant ORBs address multiple subjects.  Had the legislature addressed these subjects in separate bills, there would be no need to determine whether they were or were not appropriations.  Thus, the problem we face is in part created by apparent non-adherence to the single

---

        [8]    An example of this problem appears graphically in one measure inserted in the Education ORB that had been previously treated in a separate bill.  In May 2003, the legislature passed and transmitted to the governor House Bill 2012, which made changes to the formula for school building renewal funding.  H.B. 2012, 46th Leg., 1st Reg. Sess. (Ariz. 2003).  The governor, exercising her general power, vetoed the entire bill.  In June 2003, the legislature passed and transmitted to the governor the Education ORB, which included, among other things, the same measure amending the formula for school building renewal funding that was vetoed one month earlier in House Bill 2012.  2003 Ariz. Sess. Laws, ch. 264, § 10.  This time, the governor did not veto the entire Education ORB.  Instead, she item vetoed only the amended formula.

subject rule in the legislative process.[9]

¶40     We understand that failure to adhere to the single subject rule does not validate improper use of the governor's veto power. But at the least, we are also reluctant to confront the parameters of that power in a case in which there are also legitimate questions about whether the ORBs themselves are constitutional.  Thus, any decision on our part holding that executive misuse of the veto power occurred under Article V would of necessity require that we simultaneously validate legislation which appears to conflict with the single subject rule of Article IV.  There can be no virtue in that result.

### III. CONCLUSION

¶41     We hold, based on the facts presented, that petitioners lack standing to challenge the governor's vetoes made in connection

---

[9]     For example, the Public Finance ORB enacts the following changes, among others: an authorization for state lottery fund monies to be used for "Abstinence Only" education programs, 2003 Ariz. Sess. Laws, ch. 263, § 2; a direction to the Director of the Department of Mines and Mineral Resources to establish adult entrance fees to the museum, *id*. § 13; an authorization to the Department of Transportation to enter into intergovernmental agreements with Maricopa County to design, reconstruct, and improve a county highway bridge, *id*. §§ 15, 22; the removal of the Liquor Control Division from the Department of Public Safety, *id*. § 46; an appropriation of $75,000,000 partially to cover an income tax refund, *id*. § 69; and a direction to the Department of Public Safety to transfer two vehicles with less than 80,000 miles from the Criminal Investigations Division to the Department of Liquor Licenses and Control, *id*. § 97.  Similarly, the Education ORB and the Health and Welfare ORB, on their face, also appear to address multiple subjects.  *See* 2003 Ariz. Sess. Laws, chs. 264, 265.

-20-

with the legislative budget package for fiscal year 2004.  Although we may waive the standing requirement in an exceptional case, we decline to do so here.

¶**42**    The record contains evidence that a measure of accountability for the current dispute can properly be assessed against both sides.  Thus, in summary, even where instances of misuse of the governor's veto power may be present as alleged, the record also reflects what appear to be non-recurring instances of unconventional budget structuring, failure to attempt legislative override or to obtain authorization to maintain the action, and numerous apparent violations of the single subject rule in the ORBs.  Accordingly, notions of restraint prompt us to abstain from further consideration of this matter.  Relief is denied.


_____
                 Charles E. Jones, Chief Justice
CONCURRING:


_____
Ruth V. McGregor, Vice Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

-21-