11 So.3d 801 (2008)
Ex parte Governor Bob RILEY and Robert L. Childree, comptroller of the State of Alabama
(In re Joint Fiscal Committee of the Alabama Legislature et al. v. Governor Bob Riley and Comptroller Robert Childree).
1071702.
Supreme Court of Alabama.
December 17, 2008.
*802 Matthew H. Lembke and Andrew L. Brasher of Bradley Arant Rose & White LLP, Birmingham, for petitioner Governor Bob Riley; and Troy King, atty. gen., and William G. Parker, Jr., asst. atty. gen., for petitioner Comptroller Richard L. Childree.
Robert D. Segall and J. David Martin of Copeland, Franco, Screws & Gill, P.A., Montgomery, for respondents.
PER CURIAM.
Bob Riley, Governor of the State of Alabama, and Robert L. Childree, comptroller of the State of Alabama (hereinafter referred to collectively as "the Riley defendants"), have petitioned this Court for a writ of mandamus directing the trial court to dismiss the complaint in the underlying case against them for lack of subject-matter jurisdiction. Pursuant to this Court's order of September 23, 2008, the plaintiffs in the underlying case, Hank Sanders and Roger Bedford, members of the Alabama Senate; John Knight, a member of the *803 Alabama House of Representatives; and the Joint Fiscal Committee of the Alabama Legislature (of which Sanders, Bedford, and Knight are members) (hereinafter referred to collectively as "the legislators"), were directed to file an answer and briefs addressing the issue whether the underlying case was ripe for judicial review, and all proceedings in the trial court were ordered to be stayed during the pendency of this Court's consideration of that issue. On November 18, 2008, the parties presented oral arguments to this Court on that issue.
The underlying action arises from Governor Riley's veto of § 4 of House Bill 328 ("H.B. 328"), the general-fund appropriations bill for fiscal year 2009, enacted during the 2008 Regular Session of the Alabama Legislature. That section provides, in pertinent part:
"Of the amounts appropriated in this act from the State General Fund for the fiscal year ending September 30, 2009, 17.75% of each appropriation is conditioned upon the availability of funds in the State General Fund, the recommendation of the Director of Finance, and the approval of the Governor with the exception of the following appropriations from the State General Fund to the following agencies:

"Alabama Medicaid Agency $ 622,478,155
"Alabama Department of Public
 Health $ 84,641,324
"Alabama Department of Senior
 Services $ 17,554,599
"Alabama Department of Human
 Resources $ 112,881,321
"Alabama Department of Mental
 Health and Mental Retardation $ 143,258,026
"Department of Child Abuse and Neglect
 Prevention $ 1,011,610

"The above-listed appropriations shall be funded in their entirety from the State General Fund in [fiscal year] 2009. In the event funds are not available to fully fund the conditional appropriations from the State General Fund made in this section to other agencies, the Governor shall apportion available funds in the General Fund proportionately across-the-board to those agencies for the fiscal year that ends September 30, 2009. In the event revenue is not available to fund all of these conditional appropriations, earmarked items and line-item appropriations shall be released proportionately. On October 30, 2008, the Governor shall certify to the Director of Finance and notify the Chair of the Senate Finance and Taxation-General Fund Committee, the Chair of the House Government Appropriations Committee, and the Legislative Fiscal Officer the amount of projected available revenue in the State General Fund and the source of the additional revenue available to fund all or any portion of the conditional appropriations made in this section. The conditional appropriations made in this section from the State General Fund are first priority conditional appropriations and shall be released in their entirety before any other conditional appropriations from the State General Fund may be released. The amount of revenue certified by the Governor on October 15, 2008 [sic],[1] to be available for the conditional State General Fund appropriations made in this section shall be the amount of funds allocated proportionately to each agency for its operation plan for [fiscal year] 2009."
On May 19, 2008, pursuant to Ala. Const. 1901, Art. V, § 126,[2] Governor Riley *804 sent a message to the legislature that he was disapproving § 4 of H.B. 328:
"Beginning on page 128, line 10, by striking through line 10 and each subsequent line, through line 20, on page 128, and resuming on page 129, line 1, and striking through that line 1 and each subsequent line on page 129, through line 23, and resuming on page 130, line 1, strike through said line and each succeeding line through line 7, thus striking and deleting the entire section 4 of said bill. This item, or these items, are both illegal under the laws of the State of Alabama and unconstitutional under the Constitution of the State of Alabama. In the Alabama Constitution of 1901, as amended, in Article XI, Section 213, there is a specific constitutional requirement that the state comptroller shall issue warrants for that proportion of each claim which the money available for payment of all claims bears to the whole, and such warrants for such prorated sums shall thereupon be paid by the state treasurer. This provision clearly imposes a constitutional obligation on the state comptroller to prorate, both across the board, proportionately to all departments and agencies. Similarly, under state law, Code of Alabama, § 41-4-90, requires the governor, in the event the estimated budget resources during the budget year are not sufficient to pay all appropriations in full, to restrict allotments to prevent an overdraft or deficit in any fiscal year for which appropriations are made, by prorating, without discrimination against any department, board, bureau, commission, agency, office, or institution of the state, the available revenues among the various departments, boards, bureaus, commissions, agencies, offices, and institutions of the state. The law goes further to more specifically state, `in other words, said appropriations shall be payable in such proportion as the total sum of all appropriations bears to the total revenues estimate by the Department of Finance as available in each of said fiscal years.'
"The Legislature, in its appropriation bill, House Bill 328, cannot supersede, change, alter, or amend either this constitutional amendment or this statutory provision, both of which require proportional proration among all recipients of state funds in said appropriations bill.
"Although well intended, in the unfortunate event that proration becomes necessary, the Legislature cannot provide, either constitutionally or legally, special protection for any individual agencies or departments of state government.
"For these reasons I have found it necessary to line item veto said bill. I most sincerely encourage you to agree with my disapproval of said item, or items. Done this 19th day of May, 2008."
Section 126, Ala. Const.1901, does provide that the legislature may "repass" the vetoed item; however, Governor Riley's message was delivered to the legislature on the last day of the 2008 Regular Session of the Alabama Legislature. In an affidavit filed with the trial court, Greg Pappas, the clerk of the Alabama House of Representatives, testified that at 11:54 p.m. on *805 May 19, 2008, as a motion for adjournment sine die was being made, he was given Governor Riley's message vetoing § 4 of H.B. 328. The motion to adjourn was passed at 11:55 p.m. Thus, the legislature had no opportunity to address Governor Riley's action while it was in session.
On July 21, 2008, the legislators sued the Riley defendants in the Montgomery Circuit Court seeking declaratory and injunctive relief. The complaint alleged, among other things:
"The entire section vetoed by the Governor does not constitute an `item or items of any appropriation bill embracing distinct items' as required by Art. V, § 126, of the Constitution.
"The Governor does not have the power under § 126 or otherwise under the laws of Alabama to reduce or increase particular items in the Bill, remove substantive legislative policy or conditions from the Bill, or add to the Bill.
"Governor Riley's message, in which he conveyed his attempted item veto of Section 4 of HB 328 to the Alabama House of Representatives, failed to set out `in full' the portion of HB 328 which he attempted to veto, contrary to the express provisions of § 126.
"The Governor otherwise violated §§ 42, 43, and 126 of the Constitution, as well as other applicable provisions of law.
"Plaintiffs contend the action of the Governor, allegedly taken pursuant to § 126, to veto Section 4 of HB 328 in its entirety, is unconstitutional, null, void, and of no force or effect, and that Section 4 is therefore due to be restored to the Act.
"An actual, justiciable controversy exists between the parties by virtue of the action of the Governor allegedly made pursuant to § 126, in vetoing Section 4 of HB 328 in its entirety.
"A declaratory judgment and other equitable relief are appropriate under the circumstances to declare the respective rights, liabilities, and obligations of the parties and to protect Plaintiffs' interests."
Based on these allegations, the complaint sought the following relief:
"A. That [the Riley defendants] be made parties to this action by appropriate legal process and be required to answer or otherwise respond hereto in the manner prescribed by the Alabama Rules of Civil Procedure.
"B. That the court will require a copy of this complaint to be personally served upon the Honorable Troy King, Attorney General of the State of Alabama, pursuant to § 6-6-227.
"C. That this court will set this matter for an early hearing on [the legislators'] request for Declaratory and Preliminary and Permanent Injunctive Relief.
"D. That, upon such hearing, the court will enter a declaratory judgment or decree determining and directing the rights of the parties hereto with respect to the matters set forth in this complaint, and that in said judgment or decree this court will declare that the attempted veto of Section 4 of HB 328 is unconstitutional, and otherwise null, void, and of no force or effect, and will declare that the appropriation of funds made by the legislature pursuant to HB 328 is lawful and of full effect, including Section 4, which was struck by the Governor in his unlawful and unconstitutional attempt to exercise a veto pursuant to § 126 of the Alabama Constitution of 1901.
"E. That, upon a hearing of this cause, [the Riley defendants] and those acting in concert with them be preliminarily *806 and permanently enjoined and restrained from acting inconsistently with HB 328 as it was enacted by the legislature."
On August 25, the Riley defendants moved to dismiss the complaint on grounds that the legislators lacked standing, that the case was not ripe for review, that the case was not justiciable, and that the legislators had failed to state a claim upon which relief could be granted. On September 2, 2008, the legislators moved for a summary judgment. The trial court denied the Riley defendants' motion to dismiss and set a hearing for the legislators' summary-judgment motion on September 24, 2008. The Riley defendants moved, pursuant to Rule 5, Ala. R.App. P., for a certification to perfect a permissive appeal to this Court and, alternatively, moved for a stay of the hearing on the legislators' summary-judgment motion pending review of a petition to this Court for a writ of mandamus. The trial court denied both motions on September 19, 2008, and the Riley defendants filed this petition for the writ of mandamus. This Court stayed all proceedings in the trial court pending disposition of the Riley defendants' petition.
Our standard for the appellate review of a petition for a writ of mandamus is well settled:
"A writ of mandamus is an extraordinary remedy, and it will be `issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.' Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993). A writ of mandamus will issue only in situations where other relief is unavailable or is inadequate, and it cannot be used as a substitute for appeal. Ex parte Drill Parts & Serv. Co., 590 So.2d 252 (Ala.1991). It is well settled that `a writ of mandamus will not issue to review the merits of an order denying a motion for a summary judgment.' Ex parte Central Bank of the South, 675 So.2d 403, 406 (Ala.1996)."
Ex parte Empire Fire & Marine Ins. Co., 720 So.2d 893, 894 (Ala.1998). The sole issue before this Court is whether, under the circumstances alleged in this petition, the underlying case is ripe for review. The Riley defendants asserted that because the underlying controversy is not ripe for judicial review, they have a clear legal right to a writ of mandamus from this Court directing the trial court to dismiss the underlying case.
In a legal context,
"`[r]ipeness is defined as "[t]he circumstance existing when a case has reached, but has not passed, the point when the facts have developed sufficiently to permit an intelligent and useful decision to be made."' Ex parte Safeway Ins. Co. of Alabama, Inc., 990 So.2d 344, 352 n. 5 (Ala.2008) (quoting Black's Law Dictionary 1353 (8th ed. 2004))."
Martin v. Battistella, 9 So.3d 1235, 1240-41 (Ala.2008). Courts generally restrain themselves from addressing cases that have not reached the point of ripeness. The United States Supreme Court has stated that the basic rationale of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements ...." Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). See also National Park Hospitality Ass'n v. Department of the Interior, 538 U.S. 803, 807, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). Alabama cases often address ripeness in the context of whether a case is justiciable, or appropriate for judicial review. That is, *807 the case must concern a dispute that is "`"a real and substantial controversy admitting of specific relief through a [judgment]."'" Ex parte Bridges, 925 So.2d 189, 193 (Ala.2005) (holding that declaratory relief is not available for an "anticipated controversy" (quoting Baldwin County v. Bay Minette, 854 So.2d 42, 45 (Ala.2003), quoting in turn Copeland v. Jefferson County, 284 Ala. 558, 561, 226 So.2d 385, 387 (1969))).
In order to properly assess whether this case is ripe for review, this Court must begin with two assumptions. First, we assume that the legislative enactment of § 4 of H.B. 328 is valid, and second, we assume that Governor Riley's veto of § 4 is invalid. In the context of a determination of ripeness, and only in that context, we must determine whether, assuming that the allegations in the legislators' complaint are true, an actual, as opposed to an "anticipated," dispute has arisen such that the trial court can meaningfully adjudicate claims concerning the legislators' alleged claims of injury. Bridges and Baldwin County, supra. The Riley defendants assert that this case is not ripe for review because, they argue, the conditions imposed by § 4 of H.B. 328 are triggered only if general-fund revenues are insufficient to fully fund the conditional appropriations. The Riley defendants assert that Governor Riley's veto has not created an actual controversy that is ripe for adjudication because, they say, nothing will occur until the State allocates funds to sources that would not have otherwise received such funds had § 4 survived. Because, the Riley defendants contend, § 4 has effect only if "funds are not available to fully fund the conditional appropriations from the State General Fund" and that determination has not been made, there is no actual dispute, and the legislators' complaint is thus not ripe for review.
Although the legislators have advanced a number of arguments as to why their case is ripe for review, we focus on their assertion that a dispute presently exists because budgetary planning for State agencies for fiscal year 2009 has already begun, and State agencies have already calculated budgets based on the amount of allocations they are to receive pursuant to the redacted version of H.B. 328, i.e., the version without § 4. The legislators note that because an agency's allocations are made on the basis of that agency's absolute appropriation, those agencies that were not "protected" from proration under § 4 have already calculated budgets based on the receipt of funds that exceeds what they would receive if Governor Riley's veto is determined to be unconstitutional. The legislators presented this argument to the trial court and supported it with the affidavit of Joyce Bigbee, the director of the Legislative Fiscal Office of the Alabama Legislature. Bigbee, stated, in pertinent part:
"The fiscal year 2009 budget process is underway. State agencies were required to submit an operations plan to the Department of Finance by August 1, 2008 detailing the proposed expenditure of funds for the fiscal year. The effect of the Governor's line-item veto of Section 4 of House Bill 328 is to increase absolute General Fund appropriations by a total of approximately $180 million. Agencies were instructed by the Department of Finance to include this additional $180 million in the operations plans they have submitted. Expenditure of [fiscal year] 2009 appropriations by state agencies will begin October 1, 2008. Indeed, a percentage of the entire (now absolute) appropriation will be allotted to the agencies on October 1, 2008, and for most of the agencies, the allotment will be at least 25% of the total appropriation. For all of the agencies, the *808 allotment will be more than it would have been without the Governor's veto."
Also before the trial court was the affidavit of William D. Newton, assistant finance director for the State of Alabama. He stated, in pertinent part:
"After the Legislature adjourned in May 2008, state agencies were instructed to include in their operating budgets the appropriations purportedly made conditional by Section 4. These agencies and departments relied on Governor Riley's veto of Section 4 in planning their expenditures for Fiscal Year 2009."
The legislators note examples of agency operational funding showing that if an agency conducts its operations based on a larger budget than will actually be available in the event that Governor Riley's veto is found unconstitutional, the effect of the revival of § 4 later in the fiscal year would have a significant impact on the agency's ability to operate. This evidence supports the conclusion that, if the legislators' claims are correct, State agencies are presently spending funds for operations that are not properly available for expenditure. The present expenditure of agency operational funds means that those agencies will not have those funds available for operations later in the year. In most instances this will result in a significant impairment of an affected agency's ability to provide citizens those services the agency is obligated to supply. In some instances, this present inability to accurately determine operational budgets will result in the cessation of important services later in the fiscal year. We conclude that the legislators provided evidence to the trial court that Governor Riley's veto created an actionable dispute, i.e., evidence indicating that Governor Riley's action required the legislature to fund State agencies as though the appropriations affected by his veto were valid, even though the legislators contend that H.B. 328 was unconstitutionally limited by Governor Riley's veto.
For the purpose of assessing whether this case is ripe for review, the legislators have shown that the Governor Riley's veto of § 4 required State agencies to calculate their operating budgets based on inaccurate funding information, information that requires agencies to allocate for their operations money that will not be available. Moreover, State agencies are presently allocating and spending operating expenses according to that inaccurate information. This is not merely an "anticipated controversy." Bridges and Baldwin County, supra. In the context of a ripeness determination, Governor Riley's veto of § 4 immediately raises a dispute as to whether those State agencies that are not protected under § 4 are presently operating on budgets that, if Governor Riley's veto is held to be invalid, will exhaust their available funds before the end of the fiscal year. Accordingly, we hold that the trial court correctly denied the Riley defendants' motion to dismiss the legislators' complaint. Because the Riley defendants have no clear legal right to such relief, the Riley defendants' petition for a writ of mandamus is due to be denied.
PETITION DENIED.
LYONS, WOODALL, SMITH, PARKER, and MURDOCK, JJ., concur.
COBB, C.J., concurs specially.
SEE, STUART, and BOLIN, JJ., concur in the result.
COBB, Chief Justice (concurring specially).
I concur in the main opinion. I write specially to note that I also believe that this case became ripe for judicial review on separate bases that are resolved on a purely legal, as opposed to factual, analysis. *809 Although these points of legal analysis represent issues of first impression of the jurisprudence of this State, they find strong support in the majority of American jurisdictions.
First, I believe that the legislators suffered a legally cognizable injury the moment Governor Riley vetoed § 4 of House Bill 328 ("H.B. 328"). Assuming, only for the purpose of analyzing the ripeness issue, that Governor Riley's veto was constitutionally invalid, that veto invalidated the lawful votes of the legislators the moment it was entered. A similar situation was addressed in Silver v. Pataki, 96 N.Y.2d 532, 755 N.E.2d 842, 730 N.Y.S.2d 482 (2001). In that case, the speaker of the State Assembly for the State of New York brought an action in his official capacity seeking a judgment declaring that the governor's exercise of his line-item veto power with respect to "non-appropriation"[3] bills constitutionally invalid. Although couched in terms of challenging the speaker's standing or "capacity to sue," the governor's motion to dismiss asserted that the speaker lacked the legal capacity to bring the action because the speaker had suffered no injury, i.e., the speaker's case was not ripe for judicial review because the speaker had suffered no legally cognizable injury. The court's analysis makes this point as follows:
"A plaintiff has standing to maintain an action upon alleging an injury in fact that falls within his or her zone of interest. `The existence of an injury in factan actual legal stake in the matter being adjudicatedensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute "in a form traditionally capable of judicial resolution"' (Society of Plastics Indus. v. County of Suffolk, 77 N.Y.2d [761,] 772[, 573 N.E.2d 1034, 570 N.Y.S.2d 778 (1991)] [citation omitted]).
"Cases considering legislator standing generally fall into one of three categories: lost political battles, nullification of votes and usurpation of power. Only circumstances presented by the latter two categories confer legislator standing (see, e.g., Coleman v. Miller, 307 U.S. 433 [(1939)] [vote nullification]; Dodak v. State Admin. Bd., 441 Mich. 547, 495 N.W.2d 539 [(1993)] [usurpation of power belonging to legislative body]; cf., Raines v. Byrd, 521 U.S. 811 [(1997)] [no standing to challenge lost vote]; Matter of Posner v. Rockefeller, 26 N.Y.2d 970[, 311 N.Y.S.2d 15, 259 N.E.2d 484 (1970)] [same])."
96 N.Y.2d at 539, 755 N.E.2d at 847, 730 N.Y.S.2d at 487. In considering whether the speaker had suffered an actual injury, the Silver court then noted:
"Here, plaintiff as a Member of the Assembly won the legislative battle and now seeks to uphold that legislative victory against a claimed unconstitutional use of the veto power nullifying his vote. If plaintiff's allegations are correct, and at this point in the litigation we must assume they are, the vetoed provisions were improperly invalidated and should be in effect. Such a direct and personal injury is clearly within a legislator's zone of interest and unquestionably represents a `"concrete and particularized"' harm (Raines [v. Byrd], 521 U.S. *810 [811], at 819 [(1997)] [citation omitted]; accord, Dennis v. Luis, 741 F.2d 628, 630-631 [3d Cir. (1984)]; Fordice v. Bryan, 651 So.2d 998, 1003 [Miss. (1995)]; Hendrick v. Walters, 865 P.2d 1232, 1236-1238 [Okla. (1993)]). As [the] Supreme Court noted, plaintiff is not `seeking to obtain a result in a courtroom which he failed to gain in the halls of the Legislature' (179 Misc.2d 315, 322, 684 N.Y.S.2d 858 [(1999)])."
96 N.Y.2d at 540, 755 N.E.2d at 848, 730 N.Y.S.2d at 488. With respect to the idea of "capacity to sue," the Silver court noted that "[n]o other jurisdiction in the nation has held that an individual legislator lacks capacity to sue." 96 N.Y.2d at 539 n. 4, 755 N.E.2d at 847 n. 4, 730 N.Y.S.2d at 487 n. 4. Thus, in a situation precisely like the situation in this case, where the legislators assert that the Riley defendants injured them when Governor Riley entered his veto by nullifying their votes on a bill that had passed, the Silver court held that such a veto by a governor was an actionable injury. Moreover, the court in Silver relied upon precedent from the United States Supreme Court:
"As a Member of the Assembly who voted with the majority in favor of the budget legislation, plaintiff undoubtedly has suffered an injury in fact with respect to the alleged unconstitutional nullification of his vote sufficient to confer standing. The circumstances here are analogous to those present in Coleman v. Miller, 307 U.S. 433 [(1939)]. In Coleman, the United States Supreme Court recognized the standing of 20 members of the Kansas State Senate challenging that body's ratification of an amendment to the Federal Constitution when a 20-20 deadlock was broken by the vote of the State's Lieutenant Governor. The Supreme Court determined that the Senators had `a plain, direct and adequate interest in maintaining the effectiveness of their votes' (id., at 438); see also, Kennedy v. Sampson, 511 F.2d 430, 436 [D.C.Cir. (1974)] [no more essential interest could be asserted by a legislator than to vindicate the effectiveness of his vote]. The Court explained that the Senators' votes had been held for naught because, if their allegations were correct, the amendment would not have been ratified. Thus, the legislators were sufficiently aggrievedsuffering an injury in factto allow them to maintain the action."
96 N.Y.2d at 540-41, 755 N.E.2d at 848-49, 730 N.Y.S.2d at 488-89 (footnote omitted).
I find the analysis in Silver persuasive. In light of that analysis I conclude that the legislators here suffered a legally significant injury that gave rise to a definite and concrete controversy sufficient to ensure both that they had standing to sue and that the issue they presented was ripe for review under Alabama law at the time Governor Riley vetoed § 4. See Ex parte Bridges, 925 So.2d 189 (Ala.2005); Baldwin County v. Bay Minette, 854 So.2d 42 (Ala.2003). At the time Governor Riley exercised that veto, its effect was to invalidate votes the legislators had cast on a bill that had been passed by the Alabama Legislature. Because the legislators have "`a plain, direct and adequate interest in maintaining the effectiveness of their votes'" and because Governor Riley's veto impaired that interest, this case is ripe for judicial review in our courts.
In addition to Silver and the various state and federal cases it discusses for the proposition that this case is ripe for our review because the legislators' otherwise valid votes were invalidated by Governor Riley's veto, other cases have adopted a similar rationale for holding that judicial review of a governor's use of a line-item veto is appropriate. For example, in State *811 ex rel. Ohio General Assembly v. Brunner, 114 Ohio St.3d 386, 872 N.E.2d 912 (2007), the Supreme Court of Ohio considered a case in which the Ohio General Assembly, the president of the Senate, and the speaker of the House of Representatives petitioned for a writ of mandamus to order the Ohio Secretary of State to treat a bill that had passed the legislature as a duly enacted law for purposes of her statutory duties, when a successor governor attempted to veto the bill after his predecessor had filed the bill in the office of the Secretary of State. As did the New York court in Silver, the Ohio court in Brunner cited Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), to determine that the attempted nullification of the legislators' votes by the governor's veto was a legally cognizable injury that established their standing to sue and, based on law analogous to that of this State, see Bridges and Baldwin County, supra, caused their legal action to be ripe for judicial review. More significantly, the court in Brunner discussed the application of Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997):
"The secretary of state cites Raines v. Byrd (1997), 521 U.S. 811, 830, 117 S.Ct. 2312, 138 L.Ed.2d 849, in support of her request that this court hold that the Senate president and Speaker of the House lack standing. In Raines, the United States Supreme Court held that individual members of Congress lacked standing to challenge the constitutionality of the Line Item Veto Act because they `do not have a sufficient "personal stake" in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing.' Id.

"Raines, however, is not controlling. The congressional members in Raines challenged the constitutionality of legislation that had been passed by Congress, which they had merely voted against. Raines, 521 U.S. at 814, 117 S.Ct. 2312, 138 L.Ed.2d 849.
"Instead, this matter is akin to Coleman [v. Miller, 307 U.S. 433 (1939)], which has been interpreted as standing `for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.' Raines, 521 U.S. at 823, 117 S.Ct. 2312, 138 L.Ed.2d 849. In this case, the Senate president and the Speaker of the House voted for the bill at issue, there were sufficient votes to pass the bill, and their votes would in effect be nullified by the governor's veto and the secretary of state's refusal to treat the bill as a validly enacted law. Therefore, we hold that the Senate president and the Speaker of the House, as legislators who voted for the bill, have the requisite standing to bring this mandamus action to prevent their votes from being nullified."
114 Ohio St.3d at 390-91, 872 N.E.2d at 918.
Brunner further supports the conclusion that this case is ripe for review. Brunner makes clear that Raines is also supportive of this conclusion in that Raines establishes that had the members of Congress had their votes nullified as to a bill that had passed, i.e., had they voted in favor of the bill, they would have had the requisite standing, and their cause would have been ripe for review. Cf. Bennett v. Napolitano, 206 Ariz. 520, 81 P.3d 311 (2003).[4]
Also supporting the conclusion that the legislators' case is ripe for review are the *812 cases of South Carolina Coin Operators Ass'n v. Beasley, 320 S.C. 183, 464 S.E.2d 103 (1995), and State ex rel. Sundby v. Adamany, 71 Wis.2d 118, 237 N.W.2d 910 (1976). In Beasley, the Supreme Court of South Carolina considered a challenge by the petitioner Coin Operator's Association of the governor's line-item veto striking parts of a section of an appropriations bill relating to the regulation of video slot machines. The court held, among other things, that the petitioner's challenge presented a justiciable controversy that was ripe for judicial determination even though the South Carolina General Assembly had not yet attempted to override the veto.
In Sundby, the Supreme Court of Wisconsin considered a taxpayer's action seeking a judgment declaring that the governor's veto of portions of an appropriations bill was unconstitutional. The court in Sundby held that the taxpayer had standing, and the case was therefore justiciable and ripe for review, because "the respondent secretary of the department of revenue is administering the challenged sections of the appropriation bill as if the partial vetoes of the governor are valid and effective." 71 Wis.2d at 124, 237 N.W.2d at 913. Thus, the governor's veto, if exercised in violation of the state constitution, would directly affect the taxpayer's pecuniary interests. The rationale of Sundby also provides additional support.
As discussed in the main opinion, a dispositive factor for concluding that this case is ripe for adjudication is the fact that State agencies have already begun to calculate their budgets as if Governor Riley's veto of § 4 was valid. Assuming, only for the purposes of the ripeness analysis, that Governor Riley's veto was no valid, the effect of ignoring this present issue until a shortfall, which is already extremely probable, becomes a certainty will result in a catastrophic reduction in the operating budgets of non-protected State agencies with the likely result that essential State services will be impaired or halted completely. The effect on the pecuniary interests of the legislators as individual taxpayers is at least as profound as the effect on the taxpayer's pecuniary interests in Sundby. I believe that the courts of this State can and should address this issue as expeditiously as possible.
NOTES
[1] The disparity in the October 30, 2008, date in a preceding sentence and the October 15, 2008, date as the date that Governor Riley certifies the amount of funds available for conditional appropriations is not explained.
[2] Section 126 provides:

"The governor shall have power to approve or disapprove any item or items of any appropriation bill embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items disapproved shall be void, unless repassed according to the rule and limitations prescribed for the passage of bills over the executive veto; and he shall in writing state specifically the item or items he disapproves, setting the same out in full in his message, but in such case the enrolled bill shall not be returned with the governor's objection."
[3] The Silver court noted that "[t]he term `non-appropriation' bill is not found in the [New York] Constitution. These bills contain programmatic provisions and commonly include sources, schedules and sub-allocations for funding provided by appropriation bills, along with provisions authorizing the disbursement of certain budgeted funds pursuant to subsequent legislative enactment." 96 N.Y.2d at 535 n. 1, 755 N.E.2d at 845 n. 1, 730 N.Y.S.2d at 485 n. 1.
[4] In Bennett, four legislators, the president of the Senate, the speaker of the House, and the majority leaders of both chambers, brought an action to the Arizona Supreme Court challenging the governor's certain line-item vetoes of provisions from four bills that constituted the state's operating budget. The challenged veto struck certain budget reductions that would have otherwise been required of particular state agencies in their operations. In Bennett, the court held that the legislators lacked standing to sue based on reliance on Raines, supra, after concluding that the legislators in their case were more akin to the legislators in Raines. The court in Bennett determined that the effectiveness of the legislators' votes in their case was not affected by the governor's vetoes and stated: "[T]here is a vast difference between the level of vote nullification at issue in Coleman and the abstract dilution of institutional legislative power that is alleged here." 206 Ariz. at 526, 81 P.3d at 317. Under those circumstances the court in Bennett found no particularized injury sufficient to vest standing in the legislators.